2003 VT 52

### James STANNARD v. STANNARD COMPANY, INC., CNA Insurance Company, Peerless Insurance, Vermont Property and Casualty Insurance

[830 A.2d 66]

No. 02-378

¶ 1. May 29, 2003. CNA Insurance Company (CNA) appeals a superior court order holding CNA, and not its successor insurers Peerless Insurance and Vermont Property and Casualty Insurance,

liable for workers' compensation benefits related to the osteoarthritic condition of claimant James Stannard's right and left knees. Stannard, a plumber with the Stannard Company, suffered several injuries that aggravated and accelerated the underlying arthritic condition in his knees during the ten years that CNA carried the Stannard Company's workers' compensation insurance. The trial court held that Stannard's continued work as a plumber for three years after CNA was replaced on the risk by the two other insurance companies did not sufficiently aggravate or accelerate his medical condition so as to constitute a new injury, and therefore CNA remained solely liable for the recurrence of Stannard's osteoarthritic condition. We affirm.

¶ 2. James Stannard worked full-time for his family's plumbing and heating company for thirty-two years, from age eighteen until he was forced by his knee injuries to cease work at age fifty. During an average day, Stannard spent approximately sixty-five percent of his time on his knees, repeatedly rising and squatting. His work also involved standing on hard surfaces, performing twisting movements, and repeatedly going up and down stairs, often while carrying a five-gallon tool pail weighing between thirty-five and forty pounds. Additionally, because of his strength and large size, Stannard did much of the company's heavy lifting, such as downloading 800-pound boilers by rope and working as the "low man" when carrying old bathtubs, toilets, and radiators up and down stairs. He was often given the job of breaking apart old plumbing fixtures with a sledge hammer and hauling them away.

¶ 3. During the last thirteen years of Stannard's career, three companies provided the Stannard Company with workers' compensation insurance. CNA carried the insurance from March 30, 1985 to March 30, 1995; the Peerless Insurance Company covered March 30, 1995 to March 30, 1997; and United Pacific covered from March 30, 1997 until Stannard's last day of work on June 5, 1998. Since then, the Vermont Property and Casualty Insurance Guaranty Association has assumed United Pacific's obligations.

¶ 4. Stannard initially sought treatment for pain and swelling in his right knee in 1980 and 1983. In 1985, he had arthroscopic surgery to repair a torn meniscus in that knee. Stannard filed a first report of injury with the Department of Labor and Industry (Department) for his right knee some time during that period. During surgery, it was discovered that Stannard was suffering early degenerative changes in the right knee from osteoarthritis. Stannard returned to work, but filed additional claims with the Department for work-related injuries to his right knee in 1992, 1993, and 1994. In 1998, three years after CNA had left the risk, Stannard filed a claim with the Department that the knee surgery he had undergone years earlier was no longer sufficient and that the right knee joint was "gone." In June of 1998, Stannard underwent a less invasive high tibial osteotomy instead of a total knee replacement in hopes of being able to continue working. Complications from the surgery lasted several months, however, and the subsequent and enduring pain — together with the anticipated surgery on his other knee — forced Stannard to give up any hopes of returning to work as a plumber. He is now awaiting a total right knee replacement.

¶ 5. Regarding his left knee, Stannard filed his first report of injury with the Department after stepping into a hole and twisting his knee while working in 1989. Stannard then underwent arthroscopic surgery to repair a tear in the posterior horn of the medial meniscus. In the process, cartilage damage possibly indicating a very early stage of osteoarthritis was discovered. Stannard filed another claim after reinjuring the

left knee from a fall at work in 1994. He continued both to work and treat the left knee in the same manner as his right knee, and in 1998 filed a claim with the Department that his left knee was also "gone." In 1999, the ongoing pain in his left knee became intolerable. Based on the ineffectiveness and complications from the high tibial osteotomy on his right knee, Stannard elected to have a total left knee replacement. Following several months of therapy, Stannard reached a medical end result for his left knee sometime before the end of August 2000.

¶ 6. Stannard subsequently filed for workers' compensation benefits, and the parties litigated before the Department in 2001. After a hearing, the Commissioner of Labor and Industry (Commissioner) concluded, in relevant part, that Stannard's bilateral osteoarthritic knee condition is a compensable injury under the Vermont Workers' Compensation Act, 21 V.S.A. §§ 601-711 (the Act), and that CNA was responsible for payment of all benefits because (1) Stannard's knee injuries arose out of his employment as a plumber while CNA was on the risk, and (2) Stannard's current condition was a recurrence of injuries that had reached their full extent prior to 1995. While the Commissioner agreed that Stannard's continued employment after 1995 clearly aggravated his symptomology, i.e., his level of pain, the Commissioner held that the work did not aggravate or causally contribute to his underlying disability.

¶ 7. On appeal, pursuant to 21 V.S.A. § 671, the Commissioner certified two questions to the Bennington Superior Court: (1) whether Stannard's bilateral osteoarthritic knee condition is a compensable injury under the Act, and (2) if so, which carrier is responsible for benefits related to Stannard's (a) right knee and (b) left knee. Although entitled to a de novo hearing, the parties stipulated to waive live testimony and submitted the case on the record produced before the Department. The trial court subsequently concluded that Stannard had made out a compensable claim since, although his underlying osteoarthritic condition may have pre-existed the 1985 and 1989 injuries, those injuries and his working conditions at a minimum aggravated and accelerated this disease. The court also held that Stannard's deteriorating post-1995 condition was wholly attributable to his earlier injuries, and that the medical evidence did not show that Stannard's weight or continued work as a plumber after 1995 sufficiently accelerated, aggravated, or combined with the pre-existing injury so as to produce a greater disability than he would have otherwise experienced. The trial court therefore held CNA solely responsible for all of Stannard's workers' compensation claims. This appeal followed.

¶ 8. A trial court's conclusions that address mixed questions of law and fact will be upheld so long as the court applied the correct legal standard and the conclusions are supported by the findings. *Landmark Trust (USA), Inc. v. Goodhue*, 172 Vt. 515, 519, 782 A.2d 1219, 1224 (2001); see also *City of Burlington v. Davis*, 160 Vt. 183, 184, 624 A.2d 872, 873 (1993) (court's conclusions which address mixed questions of law and fact will be upheld if supported by the findings). Findings are reviewed for clear error, and will not be disturbed even if contradicted by substantial evidence; rather, an appellant must show that there is no credible evidence to support the findings. *Mullin v. Phelps*, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994); V.R.C.P. 52(a)(2).

¶ 9. The sole contention that CNA makes on appeal is that the trial court erred in concluding that CNA alone is liable for workers' compensation benefits for both of Stannard's knees. Specifically, CNA argues that the trial court's conclusion that "the medical evidence did not persuasively show that claimant's continued work after 1995 sufficiently accelerated his osteoarthritis to the extent that

his osteoarthritic knee condition could be considered aggravated" is clear error because (1) "sufficiently accelerate" is the wrong legal standard and (2) this finding is not supported by the evidence. We disagree.

¶ 10. CNA first argues that the traditional recurrence-versus-acceleration/aggravation analysis under Vermont's Workers' Compensation Act does not depend upon a "sufficient" degree of acceleration or aggravation as the trial court held. Instead, CNA argues, the law is that *any* acceleration or aggravation of a pre-existing condition results in a compensable claim against the employer/carrier on the risk when the acceleration/aggravation occurs. See, e.g., *Jackson v. True Temper Corp.*, 151 Vt. 592, 595, 563 A.2d 621, 623 (1989) ("Our law is clear that the aggravation *or acceleration* of a pre-existing condition by an employment accident is compensable under the workers' compensation law."). CNA argues that the undisputed fact that Stannard continued to do the same work for three years after CNA left the risk necessarily further accelerated the course of his disease, and thus, as a matter of law, shifted the liability to the later insurance carriers. CNA also argues that, under these narrow circumstances, where continuous stress and damage to the knee occur each day the claimant continues to work, the last injurious exposure rule should be applied. See *Pacher v. Fairdale Farms*, 166 Vt. 626, 628 n.2, 699 A.2d 43, 46 n.2 (1997) (mem.) (the last injurious exposure doctrine is appropriate "only where separate injuries all causally contribute to the total disability so that it becomes difficult or impossible to allocate liability among several potentially liable employers").

¶ 11. We declined to apply the last injurious exposure rule in *Pacher* and in *Ethan Allen, Inc. v. Bressett-Roberge*, 174 Vt. 518, 520, 811 A.2d 171, 172 (2002) (mem.), and do so again here. As *Pacher* established, in workers' compensation cases involving successive injuries, the employer/carrier at the time of the first injury remains liable unless the medical evidence establishes that the second injury "causally contribute[d] to the claimant's disability." 166 Vt. at 627, 699 A.2d at 46. When considering a progressively degenerative disease such as osteoarthritis, where "'the disease, if left to itself, and apart from any injury, would, in time, have inevitably caused a complete disability,'" *Jackson*, 151 Vt. at 596, 563 A.2d at 623 (quoting *Gillespie v. Vt. Hosiery & Mach. Co.*, 109 Vt. 409, 415, 199 A. 564, 566 (1938)), the causation test becomes whether, due to a work injury or the work environment, "'the disability came upon the claimant earlier than otherwise would have occurred.'" *Id.* Mere continuation or even exacerbation of symptoms, without a worsening of the underlying disability, does not meet the causation requirement. See *Ethan Allen, Inc.*, 174 Vt. at 519, 811 A.2d at 172 (original employer/carrier held liable where the employee's bilateral carpal tunnel syndrome was fully engaged and corrective surgery was already required before the change of employment, and the employee's continued work under a different employer/carrier impacted the symptoms but did not further contribute to the underlying disability); see also *City of Burlington*, 160 Vt. at 184-85, 624 A.2d at 873 (although work-related stress may have increased the frequency of seizures, the increase in symptoms was not compensable since it did not accelerate the underlying disability, a brain tumor).

¶ 12. Here, both the trial court and the Commissioner evaluated Stannard's injuries in light of the fact that osteoarthritis is a progressively degenerative disease. Both noted that Stannard's original injuries in 1985 (right knee) and 1989 (left knee), and all succeeding injuries, occurred during the ten years CNA was on the risk. Both found that the osteoarthritis was fully established in

Stannard's knees prior to 1995, and both held that the medical evidence did not persuasively show that Stannard's final three years of employment accelerated the inevitable surgery for a total knee replacement. The trial court phrased its analysis as *"sufficiently* accelerated," causing CNA to argue that sufficiency is not part of the standard. We do not find this phrasing determinative because the court went on to conclude that Stannard's deteriorating knee conditions were "wholly attributable" to his pre-1995 condition, i.e., that the underlying disability had already progressed so far that Stannard was already a candidate for total knee replacement in both knees. The evidence clearly supports this conclusion. Indeed, as noted by the Commissioner, rather than work conditions hastening the inevitable total knee replacement surgery, the evidence shows that Stannard actually worked longer than expected due to his obvious work ethic and commitment to his family business. Since the only other option would have been to undergo total knee surgery sooner, and thus be permanently disabled from working sooner, we agree with the trial court that Stannard's continued work after 1995 did not, as a matter of law, accelerate the course of his disability. See *City of Burlington,* 160 Vt. at 186, 624 A.2d at 874 (Dooley, J., dissenting) ("[T]he acceleration rule must be looked at in relation to the overall condition of the body, particularly as it relates to plaintiff's ability to work and function.").

¶ 13. CNA also argues that the evidence does not support this conclusion. CNA contends that every medical expert accepted by the court as credible testified that Stannard's work as a plumber after March 30, 1995 continued to aggravate and accelerate the progression of his osteoarthritic left- and right-knee condition. A review of the record, however, contradicts this view. Most experts, including the surgeon who performed Stannard's 1998 and 1999 operations and Stannard's long-time physician and rheumatologist, testified that Stannard's underlying osteoarthritic condition was set regardless, but that his continued heavy labor after 1995 would have worsened the symptoms of his disease. The medical evidence supports this conclusion. X-rays in 1994 on both of Stannard's knees showed a "nearly complete loss of the articular cartilage height and adjacent spurring" in both knees. Measurements done at the same time showed that Stannard's knees had tipped from valgus alignment into varus deformity, or bow-leggedness, which is caused by loss of cartilage and, after that, flaking of bone. There was expert testimony that by this time, in March of 1994, Stannard had bone riding on bone on the medial side of both knees, a point beyond which further arthritic change through loss of cartilage would not occur, even though flaking of bone, and thus the pain, may continue and worsen. The experts further agreed that even with intermediary treatments such as braces, injections, or a high tibial osteotomy, such a condition would ultimately not stabilize until the patient receives a total knee replacement. Given these facts, we cannot say that the trial court erred in finding that Stannard's osteoarthritis was fully engaged by 1995, and that the continued deterioration of his knees was wholly attributable to this pre-existing condition, even though the pain and other symptoms worsened. See *Ethan Allen, Inc.,* 174 Vt. at 519, 811 A.2d at 172 (trial court finding supported by some of the medical evidence is not clearly erroneous).

*Affirmed.*