2005 VT 4

## Susan Adams v. Reuben Adams

[869 A.2d 124]

No. 03-524

Present: **Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed January 14, 2005

*John R. Durrance, Jr.* of *Gaston, Durrance & Fairbanks,* Montpelier, for Plaintiff-Appellee.

*Kurt M. Hughes* of *Murdoch & Hughes,* Burlington, for Defendant-Appellant.

¶ 1. **Skoglund, J.** In this divorce action, husband appeals the Washington Family Court's rulings (1) denying his motion to dismiss and granting wife a divorce, and (2) directing him to pay one-half of wife's attorney's fees. Husband argues on appeal that the court should have dismissed the action because the parties had already divorced in Honduras, and that the court erred in granting attorney's fees in the absence of expert testimony concerning the reasonableness of the fees. The family court rejected both arguments after a three-day trial, and we now affirm.

¶ 2. The core issue in this case is whether the family court should have recognized an alleged divorce of the parties that husband claimed took place in Honduras in 1979. The parties first met in 1967, when husband's family bought property from wife's grandfather on an island off the coast of Honduras where wife had lived since birth. Prior to marrying appellant, wife had married, and obtained a divorce from, another man. When she divorced her first husband, appellant's father helped her obtain a lawyer. During those divorce proceedings, wife appeared in court and had to have the questions regarding the divorce read to her, as she had only a third-grade education and could not read or write. After wife's divorce, the parties married in Honduras on May 17, 1977. The oldest of their three adult children was born while they were living in Honduras.

¶ 3. In 1979, the parties visited the United States, and had conflicts as a result of staying with husband's mother as well as wife's concerns about husband's flirtatious behavior. Wife testified that because of husband's behavior, she had a one-night affair after they returned to Honduras. When she told husband about the affair, he told her he could divorce her because of her actions. However, neither party took any action based on this incident, and the parties continued to live as a married couple.[1]

¶ 4. Months later, husband told wife that a woman would be coming to their home with divorce papers for her to sign, and that if she did not sign them, he would take their son to the United States and she would never see him again. When the woman showed up with the

---

[1] Husband testified that he moved into his father's house after learning of the affair, but moved back to the marital home before the alleged divorce. However, the family court found wife's "testimony that the parties remained living together throughout this period to be credible." By contrast, the family court "did not find [husband] to be a credible witness."

papers, wife signed them even though she could not read them and nobody read or explained them to her. She testified that based on her first divorce she was aware that she had to go to court in order to have a divorce. The family court credited her testimony that she never went to court regarding the divorce husband sought to enforce in this action.

¶ 5. In any event, the parties lived together continuously as a married couple for approximately the next twenty years. They had two more children after moving to the United States in 1980, and always referred to each other as spouses. They filed income taxes jointly as spouses, and husband signed the returns each year. The deed to their property in Woodbury, Vermont states that it belongs to "Reuben and Susan Adams, husband and wife, joint tenants by the entireties." Husband prepared and signed naturalization papers for wife in 1983, in which he acted as her sponsor and described her as his wife. Their wills also refer to them as husband and wife. In sum, all of the parties' legal documents reviewed by the family court referred to them as husband and wife, and most, if not all, were prepared and executed by husband.

¶ 6. Moreover, the family court found that the parties consistently held themselves out as husband and wife in their social interactions with others. They always celebrated their wedding anniversary, sometimes with friends who were married on the same date. In 1997, on their twentieth anniversary, husband bought wife an anniversary band with three diamonds and bought himself a new gold band. Additionally, husband did not raise the alleged Honduran divorce until after the parties had met to discuss the instant divorce in 2000, and wife had obtained counsel. Indeed, the court found that husband "did not mention the alleged divorce documents that [wife] had signed for almost twenty years."

¶ 7. Husband adduced testimony from a social friend that during a visit to the parties' home, after consuming alcohol, husband had once stated that the parties were not actually married. The family court did not find the witness credible.

¶ 8. Husband also introduced into evidence certified divorce documents and statutes from Honduras, along with testimony from a Honduran attorney that the documents were true and valid. As reflected by those documents, the basis for the divorce request included the assertion that "it has become impossible for us to continue together for reasons that [are] our own concern, at the present time we are distanced from one another to such an extent that there is no bond between us after two years of marriage." While the court found the

documents to be authentic and therefore received them into evidence, it also found that "[t]he evidence was not clear" that the parties had actually appeared before the Honduran court prior to the divorce decree's issuance. Specifically, the court noted that the documents do not indicate that the parties themselves appeared, and they suggest that an attorney appeared for both of them. Further, the Honduran attorney who testified at trial had not spoken with the person who allegedly represented both parties before the Honduran court.

¶ 9. The essence of defendant's argument in this case is that the family court erred by denying his motion to dismiss because it should have recognized the Honduran divorce as a matter of comity. The Full Faith and Credit Clause, U.S. Const. art. IV, § 1, does not apply to judgments obtained in a foreign country, *Aetna Life Ins. Co. v. Tremblay*, 223 U.S. 185, 190 (1912), and so a U.S. court may, but is not required to, recognize a divorce decree from a foreign country under the doctrine of comity. See *Office of Child Support v. Sholan*, 172 Vt. 619, 620, 782 A.2d 1199, 1202 (2001) (mem.) (recognizing that a Vermont court may give effect to foreign child support orders under the doctrine of comity). The question of whether the family court correctly applied the doctrine here turns on the court's factual determinations regarding the nature of the Honduran documents and proceedings and the conduct of the parties, and its legal determination as to whether or not to recognize the Honduran divorce decree in light of those facts. Thus, this case presents a mixed question of law and fact. See, e.g., *Luneau v. Peerless Ins. Co.*, 170 Vt. 442, 445, 750 A.2d 1031, 1033 (2000) (holding that an inquiry that requires the court to determine the nature of a party's conduct and whether that conduct fit an insurance policy exclusion was a mixed question of law and fact).

¶ 10. We will uphold a trial court's conclusions concerning a mixed question of law and fact if the court applied the correct legal standard and its conclusions are supported by its factual findings. *Stannard v. Stannard Co.*, 2003 VT 52, ¶ 8, 175 Vt. 549, 830 A.2d 66 (mem.). We review the factual findings of a trial court in the light most favorable to the prevailing party. *Cloutier v. Blowers*, 172 Vt. 450, 452, 783 A.2d 961, 963 (2001). We will not disturb the trial court's factual findings unless they are clearly erroneous, even if the record contains inconsistencies or substantial evidence to the contrary. *Pion v. Bean*, 2003 VT 79, ¶ 15, 176 Vt. 1, 833 A.2d 1248. This follows because "[a]s the trier of fact, it [is] the province of the trial court to determine the credibility of

the witnesses and weigh the persuasiveness of the evidence." *Id.* ¶ 17 (quotation omitted). Our review of the court's legal determinations, however, is nondeferential and plenary. *Thompson v. Dewey's S. Royalton, Inc.*, 169 Vt. 274, 276, 733 A.2d 65, 67 (1999).

¶ 11. As the family court correctly recognized, this Court has applied the standards laid out in the Restatement (Third) of Foreign Relations Law of the United States to determine whether a trial court properly recognized a foreign judgment. In *Sholan*, we noted that "[a]s a general matter, under principles of comity, final judgments of courts of foreign nations . . . are conclusive between the parties to the action and are entitled to recognition in United States courts." *Sholan*, 172 Vt. at 621, 782 A.2d at 1203 (citing Restatement (Third) of Foreign Relations Law of the United States § 481 (1987) [hereinafter Restatement]). We then summarized the Restatement's general standards for recognizing a judgment from a foreign nation as follows:

> For a court to recognize and give effect to a foreign order, the judgment must have been rendered under a judicial system which provides impartial tribunals and procedures compatible with due process of law, and the issuing court must have had jurisdiction over the defendant sufficient to support rendering such a decision in the state in which the order is sought to be enforced. [Restatement] § 482(1). If these prerequisites have been met, the state court may still decline to recognize the foreign order, if the issuing court lacked subject matter jurisdiction over the action; the defendant was not accorded adequate notice of the proceeding; the judgment was obtained by fraud; the original action or judgment is in conflict with state or federal public policy; the judgment conflicts with another judgment entitled to recognition; or the foreign proceeding was contrary to an agreement by the parties to submit the controversy to another forum for resolution. *Id.* § 482(2).

*Sholan*, 172 Vt. at 622, 782 A.2d at 1203-04.

¶ 12. In addition to these standards for recognition of foreign judgments generally, the Restatement provides guidance specific to the recognition of foreign divorce decrees:

> (1) Courts in the United States will recognize a divorce granted in the state in which both parties to the marriage had their domicile or their habitual residence at the time of divorce, and valid and effective under the law of that state.

(2) Courts in the United States may, but need not, recognize a divorce, valid and effective under the law of the state where it was granted,

> (a) if that state was, at the time of divorce, the state of domicile or habitual residence of one party to the marriage; or

> (b) if the divorce was granted by a court having jurisdiction over both parties, and if at least one party appeared in person and the other party had notice of and opportunity to participate in the proceeding.

(3) A court that would not recognize a divorce that is within Subsection 2(a) or 2(b) may nevertheless recognize such a divorce if it would be recognized by the state where the parties were domiciled or had their habitual residence at the time of the divorce.

Restatement § 484.

¶ 13. In light of the factual findings described above, the family court properly concluded that the divorce decree was not valid and effective under Honduran law, and correctly declined to recognize the decree under the doctrine of comity. According to the certified translations of the relevant Honduran code provisions introduced by husband at trial, Article 145 of Chapter XII on Divorce provides that "[t]here cannot be a divorce decree if there has been a reconciliation or marital relations between the spouses, if these happen after the acts that could have authorized it, or after the request for divorce." The family court found that "[t]he credible testimony is that the parties never separated even for one night. The marital relationship continued during the time the parties were in Honduras and for many years after in the United States." Thus, the court held that Article 145 precluded the Honduran divorce, since the parties had "reconciled" — indeed, they had never even separated so that they could then get back together — after the request for the divorce.

¶ 14. Two additional family court findings buttress this conclusion. First, the family court found that the decree was "based on a false representation that it would be impossible for [the parties] to resume marital relations when in fact they never stopped living together, held themselves out as a married couple, and otherwise remained married"

for approximately twenty years after the date of the decree. Second, the family court "found credible the testimony of [wife] that she did not receive notice of the divorce proceedings nor did she have the opportunity to appear before the Honduran Court." Given the decree's failure to comply with the relevant Honduran code provision, coupled with the "false representation" that formed the decree's basis and wife's lack of a meaningful opportunity to appear before the Honduran court, the family court correctly concluded that the decree was invalid under Honduran law.[2] Therefore, we conclude that, because comity presupposes a "valid and effective" divorce decree, see Restatement § 484(1)-(2) (outlining when courts "will" or "may" recognize a divorce that is "valid and effective under the law" of the state where it was granted), the family court properly declined to recognize the Honduran divorce decree.

¶ 15. Further, we are unmoved by husband's laches argument. As a preliminary matter, it is not clear from the record that husband even presented this issue to the family court. In his reply brief, husband points to a single remark made by his attorney during a proffer of the proposed testimony of a witness, in which his attorney stated that the testimony "goes to our [laches] argument." Failure to raise an issue before the trial court precludes raising it on appeal. *Denton v. Chittenden Bank*, 163 Vt. 62, 69, 655 A.2d 703, 708 (1994).

¶ 16. Assuming that husband did preserve this issue, we nonetheless reject his argument. "Laches is the failure to assert a right for an unreasonable and unexplained period of time when the delay has been prejudicial to the adverse party, rendering it inequitable to enforce the right." *Chittenden v. Waterbury Ctr. Cmty. Church, Inc.*, 168 Vt. 478, 494, 726 A.2d 20, 30 (1998) (quotation omitted). Delay alone is insufficient to invoke laches — the delay must be unexcused and prejudicial. *Id.*

¶ 17. In this case, it is difficult to discern how wife failed to assert any right, let alone how her conduct worked any possible prejudice to husband. As the family court found, husband's conduct during the more than twenty years that the parties lived together prior to the instant divorce gave every indication, both to wife and to the outside world, that the parties were married. Indeed, husband represented as

---

[2] Husband argues that, under *Lariviere v. Lariviere*, 102 Vt. 278, 147 A. 700 (1929), the validity of the divorce must be determined according to Honduran law. Even assuming husband's interpretation of *Lariviere* is correct, his argument fails for the reasons explained above.

much on numerous documents filed with federal and state authorities. Moreover, the family court credited wife's testimony that she did not know about or appear at the Honduran divorce proceedings. Under these circumstances, it strains reason to contend that wife has "delayed" asserting any legal right. Additionally, the circumstances of this case amply explain the purported "delay" that husband asserts, and the fact that wife did not challenge the applicability of the Honduran divorce until these proceedings worked no discernible disadvantage to husband. See *Kanaan v. Kanaan*, 163 Vt. 402, 413, 659 A.2d 128, 136 (1995) (noting that a delay must "work[] a disadvantage to another" in order to invoke laches). Therefore, his laches argument fails.

¶ 18. Finally, husband argues on appeal that the family court erred in ordering him to pay one-half of wife's attorney's fees. Specifically, he claims that the court should not have admitted wife's attorney's bill into evidence without expert testimony as to the reasonableness of the fees. We disagree and affirm the family court's award of attorney's fees.

¶ 19. Husband's argument fails because it overlooks "the peculiar nature of divorce and similar actions." *Ely v. Ely*, 139 Vt. 238, 242, 427 A.2d 361, 364 (1981). Divorce cases

almost always [involve] the financial circumstances and abilities of the parties as matters in controversy, and [are] matters of common occurrence in the trial courts, obviat[ing] the necessity for a separate hearing, *or the taking of particular evidence*, on the question of awarding of attorney fees or suit money. In the usual, and vast majority of, cases such allowance borders on judicial routine, and is supported by evidence bearing on the circumstances of the parties generally.

*Id.* (emphasis added). As a result, the trial court may award attorney's fees in its discretion in light of its own knowledge and experience, without separate evidence of the reasonableness of the fees. *Milligan v. Milligan*, 158 Vt. 436, 444, 613 A.2d 1281, 1286 (1992).

¶ 20. Husband relies on several nondivorce cases for the proposition that a party "has the burden to provide evidence of services upon which value can be determined." *Bruntaeger v. Zeller*, 147 Vt. 247, 254, 515 A.2d 123, 128 (1986). As explained above, in light of the "peculiar

nature" of divorce actions, the family court's "detailed findings on the general financial circumstances of the parties support the fee award." *Milligan*, 158 Vt. at 444, 613 A.2d at 1286. Accordingly, we affirm the family court's award of attorney's fees to wife.

*Affirmed.*