2009 VT 30

# William Borden, Richard Pahl and Brian Pelletier v. Robert D. Hofmann

[974 A.2d 1249]

No. 06-345

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed March 13, 2009

*Matthew F. Valerio*, Defender General, and *Seth Lipschutz* and *Dawn Seibert*, Prisoners' Rights Office, Montpelier, for Plaintiffs-Appellants.

*William H. Sorrell*, Attorney General, Montpelier, and *Kurt A. Kuehl*, Assistant Attorney General, Waterbury, for Defendant-Appellee.

¶ 1. **Skoglund, J.** This case requires us to determine whether placing an inmate on a Nutraloaf-and-water diet in response to misconduct constitutes "punishment" within the meaning of 28 V.S.A. § 851, thereby requiring a hearing prior to implementation of the diet under § 852. This case does *not* present the question of whether the imposition of such a diet is cruel and unusual punishment, or even whether its substitution for standard prison fare is a deprivation significant enough to trigger the protection of constitutional due process guarantees. Nor does this case challenge the imposition of a Nutraloaf-and-water diet per se. Rather, this case presents the fairly pedestrian question of what the Legislature meant when it commanded the Department of Corrections to afford inmates the fact-finding hearing described in § 852 prior to punishment. The superior court concluded that the Nutraloaf-and-water diet is not punishment, and thus is not subject to the hearing process required by statute. We hold that the Nutraloaf-and-water diet is punishment within the meaning of § 851 that may be imposed only in accordance with the statutory provisions found in §§ 851-853.

¶ 2. Petitioners are inmates in the custody of the Vermont Department of Corrections who challenge the Department's practice of placing inmates on a diet of Nutraloaf, without a hearing,

in response to inmates' abuse of food, utensils, or bodily waste. Nutraloaf consists of a compost of whole wheat bread, nondairy cheese, carrots, canned spinach, raisins, canned Great Northern beans, vegetable oil, tomato paste, powdered milk, and potato flakes, mashed together and baked in a loaf pan.

¶ 3. Petitioners brought this declaratory-judgment action in superior court. The trial court denied the petition, concluding that the Nutraloaf diet was not a punishment. The trial court found that Nutraloaf was designed to be "less appealing than normal food," and that "[t]he Department could give other food (such as sandwiches) that would not require utensils, plates or cups." However, the trial court reasoned that "the effectiveness of the program would be undermined if the meals were appealing to the point of providing an incentive for misbehavior." The court further determined that "[t]he primary goal of the Nutraloaf program is to limit an inmate's ability to misuse food, utensils, or bodily wastes, by eliminating utensils, by presenting the food in a form that is less messy, and also perhaps by reducing the available bodily wastes by imposing a high-fiber diet." Finally, the trial court concluded that the evidence that the Department intended Nutraloaf as punishment was not strong, that the Department had "legitimate non-punitive purposes" for implementing the program, and that "the punitive aspects of the program will not be excessive in relation to its purposes."

¶ 4. The Nutraloaf diet is authorized by Departmental Directive 413.09, "Special Management Meals in Facilities." Directive 413.09 recites that it was promulgated to "reduce or limit the ability of inmates to misuse bodily waste or food (including utensils) which may pose a risk to other inmates and staff." The directive defines the "misuse of food or bodily waste" as:

> Disruptive behaviors by inmates that involve mishandling of food or bodily waste including, but not limited to, assaulting others with food or bodily waste; smearing of bodily waste on persons or property or other mishandling of food or bodily waste; use of utensils as weapons or other tools for which they were not intended; refusal to return utensils; and tampering with or jamming the food slot.

In accordance with this provision, when an inmate engages in the offending behavior, prison officials are authorized — after assess-

ing whether other attempted interventions such as warnings have occurred — to place the inmate in administrative segregation and on a "special management meal" regime. On this regime, an inmate is served Nutraloaf in lieu of standard prison fare three times daily, for a maximum of seven days, during which time the inmate may remain hydrated by drinking water out of a tap in his or her cell. It is uncontroverted that Nutraloaf is nutritionally adequate to sustain life.

¶ 5. The directive anticipates that inmates may continue the offending behavior after imposition of the Nutraloaf-and-water regime. The directive requires that "[a]n inmate's progress will be reviewed by a Shift Supervisor within three (3) calendar days, and if the disruptive behavior stops before the end of the period imposed, the Shift Supervisor may return the inmate to regular meals." Pursuant to the directive, "in making decisions to continue [] placement" on the diet, the supervisor is to "consider circumstances such as . . . the continued display of the original behavior."

¶ 6. The record does not reveal how much time elapses between detection of the offending behavior and imposition of the loaf regime. The directive requires that the Nutraloaf diet "be implemented as soon as possible after the disruptive behavior has taken place, to achieve the greatest level of behavior change." However, pursuant to the directive, several steps must be taken before serving an inmate his or her first loaf. Staff who observe an inmate misusing food or bodily waste are to report their observations to the shift supervisor by filling out and relaying certain paperwork. After considering "any precipitating events and other attempted interventions," if the supervisor decides that a Nutraloaf diet constitutes an appropriate consequence for the offending behavior, he or she relays a written recommendation to the superintendent and to the facility physician for approval. If the inmate has a serious mental illness, the physician will consult with the psychiatrist prior to approving the diet. The written approval of the physician and the superintendent is required prior to the imposition of the regime. After the decision has been made to put an inmate on a Nutraloaf-and-water diet, prison staff provides the inmate with written information about the procedure, including an explanation as to why the inmate is being placed on the diet, the schedule of daily servings, the nutritional content of

the meal, and a recommendation that the inmate drink "plenty" of water.[1]

¶ 7. While the other procedures associated with serving Nutraloaf vary depending on circumstance — namely, whether an inmate committed the offending behavior while already in either administrative or disciplinary segregation for an unrelated infraction — it is uncontroverted that in *no* circumstance does the Department afford an inmate the opportunity to contest the factual predicate for the implementation of the diet via the procedures outlined in § 852. Rather, as the trial court found, the Department imposes the regime "unilaterally."

¶ 8. As noted, this case presents only the question of whether the Nutraloaf-and-water diet is a "punishment" requiring the statutory protections provided by §§ 851-853.[2] Section 851 states that no "punishment [shall] be imposed otherwise than in accordance with the provisions of this subchapter." *Id.* § 851. Section 852 requires that "[i]n disciplinary cases . . . [the Department] shall conduct a fact-finding hearing" prior to punishment, at which the inmate is entitled to notice of the charge, to confront the person bringing the charge, to testify, and to question witnesses. *Id.* § 852(b). Section 853 describes the types of punishment that may be imposed by the disciplinary committee when an inmate breaks prison rules. *Id.* § 853. Punishment for a breach of the rules and regulations of the facility generally consists of the deprivation of privileges. *Id.* § 853(a)(1). For "serious breaches," the disciplinary committee may recommend a variety of sanctions, including the deprivation of privileges or placement in a disciplinary segregation unit. *Id.* § 853(a)(2).

¶ 9. The question of whether the imposition of the Nutraloaf-and-water diet is a "punishment" within the meaning of § 851 requires us to review both the trial court's legal conclusions and

---

[1] The trial court found that "Nutraloaf requires an extraordinary amount of water in order to appropriately process the food through the body." While on the Nutraloaf diet, the inmate is encouraged to drink "plenty" of water due to the high fibrous content of the meal. The total fiber content of Nutraloaf is seventy-two grams daily, while the recommended daily intake of fiber is twenty to thirty grams each day.

[2] Petitioners also argue that imposing Nutraloaf without a hearing violates the Vermont Constitution, and that the Department is violating Directive 410.01 by not providing a hearing. Because neither claim was raised below, we need not address these issues on appeal. See *In re Ochs*, 2006 VT 122, ¶ 16 n.2, 181 Vt. 541, 915 A.2d 780 (mem.) (declining to address Vermont constitutional claim not raised below).

its factual findings. While the trial court's conclusions as to issues of law will be reviewed de novo, we will not disturb its factual findings unless clearly erroneous. V.R.C.P. 52(a)(2); *Elkins v. Microsoft Corp.*, 174 Vt. 328, 330, 817 A.2d 9, 12 (2002) ("To the extent that our review of the trial court's decision involves questions of statutory construction, and thus questions of law, it is nondeferential and plenary.").

¶ 10. In construing § 851 anew, we keep in mind the following principles of construction: "we look first to the plain, ordinary meaning of the language," "[w]e construe closely related statutes together as part of one system," and "[w]e defer to the construction of a statute by the agency responsible for implementing it." *State v. Rolfe*, 166 Vt. 1, 7, 686 A.2d 949, 954 (1996) (quotation omitted).

¶ 11. Upon review of a trial court's factual findings, findings of fact are clearly erroneous if internally inconsistent. See *Aponte v. Calderon*, 284 F.3d 184, 194 (1st Cir. 2002) (noting that internally inconsistent factual findings are clearly erroneous under identical federal standard set forth in Federal Rule of Civil Procedure 52(a)); *Mendiola v. United States*, 994 F.2d 409, 410 (7th Cir. 1993) ("Findings are clearly erroneous if the trial court's interpretation of the facts is implausible, illogical, [or] internally inconsistent . . . ."). In particular, when subsidiary factual findings are inconsistent with ultimate factual findings, the ultimate factual finding may not stand. *Aponte*, 284 F.3d at 194 (when subsidiary factual findings are inconsistent with ultimate factual findings, the ultimate finding is clearly erroneous); *Alfaro De Quevedo v. De Jesus Schuck*, 556 F.2d 591, 593 (1st Cir. 1977) (same). We address the trial court's legal conclusions and factual findings in turn.

¶ 12. We have had occasion to construe § 851 before; in *Conway v. Cumming*, we held that revoking a prisoner's furlough status was not "punishment" within the meaning of § 851. 161 Vt. 113, 119, 636 A.2d 735, 738 (1993). In so holding, we adopted the test used by the United States Supreme Court to evaluate a similar question in *Bell v. Wolfish*, 441 U.S. 520 (1979). In *Bell*, the Court examined whether certain correctional facility practices — including double-bunking pretrial detainees in single-person cells — converted pretrial detention into preprocess "punishment" in violation of the Due Process Clause of the United States Constitution. Evaluating whether this living situation was punitive,

the Court articulated and applied three criteria. The *Bell* Court first asked whether the double-bunking was "imposed for the purpose of punishment." *Id.* at 538. "Absent a showing of . . . intent to punish," the Court continued, whether the policy constitutes punishment depends on "whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and [finally,] whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (quotation omitted). The *Bell* Court concluded that the prison's policy of double-bunking inmates was not intended to punish, and that the practice reasonably served the important governmental objectives of ensuring a defendant's presence at trial and the need for government to effectively manage prison facilities. *Id.* at 539-40.

¶ 13. While still incarcerated, the petitioner in *Conway* had been allowed to make short visits to the community, but this privilege was revoked by the Commissioner without a hearing for negative behavior. 161 Vt. at 114-15, 636 A.2d at 736. The petitioner challenged this revocation, claiming that it was punishment and that he was therefore entitled to the procedural protections codified in § 852. We examined the three *Bell* criteria, focusing on the Supreme Court's holding that "absent an intent to punish, a government decision that is reasonably related to a legitimate governmental purpose is not punishment." *Id.* at 119, 636 A.2d at 738. We concluded that revocation of the petitioner's furlough status was not punishment, though we came to this conclusion without actually applying the three *Bell* factors. *Id.* (holding that the petitioner had no liberty interest in a furlough program, nor did he point to any restriction suffered other than continuation of the incarceration to which he was legally sentenced). Such being the case, *Conway* is of limited assistance — except insofar as it identifies the relevant inquiry — to the question we face today.

¶ 14. Citing *Conway*, the trial court identified the correct factors for consideration. Applying the first factor, the court concluded that the Nutraloaf-and-water diet was not imposed for the purpose of punishing inmates. We disagree and hold that the regime constitutes punishment under § 851.

¶ 15. The trial court did not explicitly find that the Nutraloaf regime was without *any* punitive intent, but concluded that the evidence that the Department intended Nutraloaf as punishment

was not strong, that the Department had "legitimate non-punitive purposes" for implementing the program, and that "the punitive aspects of the program will not be excessive in relation to its purposes." We read the trial court's decision as acknowledging mixed motives on the part of the Department with regard to the Nutraloaf program.

■ ■ ¶ 16. We do not disagree that the Department's motives were mixed,[3] but to the extent that the superior court ultimately found that the Department's purpose was primarily nonpunitive, the court erred. Consistent with the directive's stated goal to "reduce or limit" offending behavior, actual prevention of the misuse of food or bodily wastes is not the aim of Nutraloaf. We do not understand the Department to argue to the contrary.[4]

---

[3] Our acknowledgement that the Department's motives were mixed does not, as the dissent argues, undermine our decision by virtue of State v. Strong, 158 Vt. 56, 605 A.2d 510 (1992). In Strong, we held that the civil suspension of a driver's license for driving under the influence was not "punishment" such that the driver's subsequent prosecution for DUI ran afoul of the Double Jeopardy Clause's prohibition "against multiple punishments for the same offense." Id. at 59, 62, 605 A.2d at 512, 514 (quotation omitted). The dissent's claim that we evaluated "mixed motives" in Strong is misleading. Post, ¶ 29. In Strong, we noted that "[t]he fact that a statute designed primarily to serve remedial purposes incidentally serves the purpose of punishment as well does not mean that the statute results in punishment for double jeopardy purposes." Id. at 62, 605 A.2d at 514 (quotation omitted). However, that reasoning does not bear on this case.

Strong was a case involving mixed effects rather than mixed motives. In Strong, having concluded that the Legislature intended the penalty to be remedial rather than punitive, we evaluated whether the effects of the statutory scheme were so punitive as to negate the Legislature's intent — in other words, applying the second and third prongs of the Bell analysis. Id. at 60, 605 A.2d at 513. In so doing, we grappled with the mixed punitive and remedial effects of the civil suspension scheme. Id. at 60-61, 605 A.2d at 513-14. In this case we do not consider the effects of the Nutraloaf regime under Bell because we conclude that the Department's purpose was primarily deterrence.

[4] We assume that the Department does not intend for Nutraloaf to prevent inmates from misusing their feces by subjecting them to constipation. The trial court did find that "perhaps . . . reducing the available bodily wastes by imposing a high-fiber diet" was among the Department's aims. However, this finding makes little sense. The Department would be hard pressed to argue that an intentional regime of constipation was even consistent with "minimum standards of respect for human dignity" as required by the prohibition against cruel and unusual punishment. Landman v. Royster, 333 F. Supp. 621, 647 (E.D. Va. 1971); see also Clark-Murphy v. Foreback, 439 F.3d 280, 292 (6th Cir. 2006) (characterizing an inmate's Eighth Amendment right to food and water as "clearly established").

Rather, the program's implementing directive contemplates that the offending behavior may continue after imposition of the diet. Only if the behavior has ceased within three days of implementation is the supervisor authorized to reintroduce standard prison fare to an offending inmate. This, together with the trial court's finding that Nutraloaf was designed to be unappetizing, compels the conclusion that deterrence is central to the Nutraloaf program. Prevention aims to remove the means to do something, while deterrence, by contrast, aims to convince a person not to do something that they retain the ability to do. Nutraloaf — a purposefully unappetizing alternative to standard prison food — may be served along with the implements used to commit the targeted malfeasance,[5] and under directions that the diet continue until the inmate decides to stop engaging in the offending conduct. We hold that the principal aim of the Nutraloaf program is to deter.

¶ 17. As the United States Supreme Court stated in *Kennedy v. Mendoza-Martinez*, "retribution and deterrence" are "traditional aims of punishment." 372 U.S. 144, 168 (1963); see also *Strong*, 158 Vt. at 59-60, 605 A.2d at 512 (recognizing that deterrence and retribution are punitive governmental objectives). We conclude that the Nutraloaf-and-water regime is classic punitive deterrence.

¶ 18. That there are less restrictive means to achieve the preventative ends of the directive is another indication of the Department's punitive intent. See *Bell*, 441 U.S. at 539 n.20 (reasoning that the availability of "less harsh methods" to achieve otherwise legitimate objectives can demonstrate intent to punish). The Department argues that in order to be effective, Nutraloaf must be unappetizing. The Department suggests, and the trial court reasoned, that serving a sandwich — which requires neither a tray nor utensils and therefore has all the preventative qualities of Nutraloaf — would be less effective than Nutraloaf because it could incentivize prohibited conduct where, for example, an inmate did not like what was being served for dinner. While we find this argument to be speculative, see *Rust v. Grammer*, 858 F.2d 411, 414 (8th Cir. 1988) (evaluating inmates' claim that temporary diet

---

[5] Under the directive, "[a]ny food or items that may be used as containers to throw food or bodily waste will be removed from the inmate's cell." However, only "[i]f misuse involved utensils," will "they [] be removed from the food tray."

of sandwiches and water was cruel and unusual punishment), this is not its principal weakness. Rather, the Department's focus on incentives betrays its acknowledgement of the disincentive — or, in other words, deterrent — properties of Nutraloaf.

¶ 19. Courts in other jurisdictions facing similar issues have come to various conclusions. On the one hand, courts evaluating whether Nutraloaf-like diets constitute cruel and unusual punishment have adjudged that similar regimes were "punishment," albeit of the non-cruel-and-unusual variety. *LeMaire v. Maass*, 12 F.3d 1444, 1455 (9th Cir. 1993) (upholding district court's finding that "Nutraloaf was being used punitively to control inmate behavior"); *Breazil v. Bartlett*, 998 F. Supp. 236, 242 (W.D.N.Y. 1997) (characterizing restrictive diet of Nutriloaf-and-cabbage as "punitive"); *United States v. Michigan*, 680 F. Supp. 270, 274 (W.D. Mich. 1988) (finding that food loaf is a "punishment" designed to "impress[] inmates with the understanding that extremely unpleasant results will occur whenever they engage in the prohibited behavior"); *Arnett v. Snyder*, 769 N.E.2d 943, 948-50 (Ill. App. Ct. 2001) (evaluating "punishment" called "meal loaf" under the Eighth Amendment), *petition for leave to appeal denied*, 766 N.E.2d 238 (Ill. 2002). Our decision is entirely consistent with these cases.

¶ 20. On the other hand, one federal district court has twice granted summary judgment to state defendants in cases where a loaf diet was challenged on due process grounds. *Joseph v. Arpaio*, 2008 WL 243690, slip op. at *6 (D. Ariz. 2008) (granting summary judgment to state defendants where plaintiff failed to rebut evidence that loaf program was reasonably related to a legitimate governmental objective); *Bugoni v. Coffman*, 2006 WL 3333078, slip op. at *9 (D. Ariz. 2006) (reasoning that, based on the summary judgment evidence, the loaf program was not punitive).[6]

---

[6] The most analogous case to the one at bar is *Arnett*, in which the court was also faced with a statutory-construction issue. The *Arnett* court evaluated whether the imposition of a "meal loaf" regime similar to Nutraloaf violated a statute prohibiting "disciplinary restrictions on diet." 769 N.E.2d at 948 (quotations omitted). The court characterized the diet as "punishment," but nevertheless upheld "meal loaf" under the statute. The court appears to have held that only nutritionally inadequate diets, like that of bread-and-water, constitute "disciplinary restrictions on diet" within the meaning of the statute. We note that nutritionally inadequate diets are prohibited as cruel and unusual. See, e.g., *Green v. Ferrell*,

■ ■ ¶ 21. "Our paramount goal, when interpreting a statute, is to effectuate the intent of the Legislature." *Dep't of Corr. v. Human Rights Comm'n*, 2006 VT 134, ¶ 7, 181 Vt. 225, 917 A.2d 451 (quotation omitted). Therefore, while we appreciate that there have been a variety of judicial responses to challenges — under various legal theories — to Nutraloaf-like programs, we are ever mindful of the fact that, in the end, those judicial responses are not relevant to our ultimate aim. We are confident that the plain and ordinary meaning of "punishment" — to which we are bound — is consistent with our decision today. *Rolfe*, 166 Vt. at 7, 686 A.2d at 954 (in construing a statute, we look first to the "plain, ordinary meaning" of its language). Indeed, we note that the plain and ordinary meaning of "punishment" is more than broad enough to encompass the Department's use of Nutraloaf for deterrence. For instance, while Black's Law Dictionary defines "deterrent punishment" as that which is "intended to deter the offender and others from" malfeasance, it also notes that "preventative punishment" is "intended to prevent a repetition of wrongdoing by disabling the offender." Black's Law Dictionary 1270 (8th ed. 2004).

¶ 22. Finally, we are compelled to address the dissent's parade of horribles. First, the dissent laments that as a result of our decision today, the Department will no longer be able to take "swift, temporary, and entirely unhurtful" action in response to the serious misconduct the Nutraloaf program is designed to address. *Post*, ¶ 38. There is no basis in the record or in logic for the conclusion that our decision deprives the Department of the ability to take swift action, or the assumption that the Nutraloaf regime is unhurtful. The dissent points to no evidence regarding how swiftly the Department implements the Nutraloaf diet in light of the extensive procedures it already follows prior to the first feeding, see *supra*, ¶ 6, how long, as a relative matter, compliance with § 852 would take, or the absence of alternative, primarily preventative actions that can be taken without the hearing the dissent assumes is so burdensomely slow. And we find especially curious that the dissent chooses to characterize the Nutraloaf

---

801 F.2d 765, 770 (5th Cir. 1986) ("The eighth amendment requires that jails provide inmates with well-balanced meals, containing sufficient nutritional value to preserve health." (quotation omitted)); *Landman*, 333 F. Supp. at 647 (holding that bread-and-water diet violates Eighth Amendment). We find limited guidance in this confusing decision.

regime as "entirely unhurtful," *post*, ¶ 38, an assumption in considerable tension with the trial court's finding that constipation may have been one of Nutraloaf's aims, and with the extensive medical follow-up mandated by the regime's terms.

¶ 23. Second, the dissent claims that our opinion presents the Department with "a Hobson's choice of either providing misbehaving inmates with their choice of foods that are likely *more* appetizing than standard prison fare, thereby encouraging the very behavior that it needs to prevent, or simply doing nothing." *Post*, ¶ 37. The dissent's suggestion that our decision requires the Department to give inmates — misbehaving or otherwise — "their choice of foods" is ludicrous. The dissent's concern that our decision requires the Department to guard against providing disincentives by designing special management meals to be more appetizing than standard prison fare overlooks the fact that it is the Department's intent, and not the tastiness of the food, that is the focus of our inquiry. In any event, what the dissent calls a "Hobson's choice"[7] is but a false dilemma, for the dissent fails to consider at least one rather obvious option — that in response to inmate misconduct, the Department may serve standard prison fare not requiring utensils and trays until guilt is determined at a § 852 hearing after which the Nutraloaf regime may be implemented. The only true Hobson's choice facing the Department is its "option" of following the law.

¶ 24. In sum, the Nutraloaf-and-water regime constitutes "punishment" within the meaning of § 851. To hold otherwise would be to turn a blind eye toward the regime in the name of deference to the Department. This we will not do. Before they may be placed on the diet, inmates are entitled to process in accordance with §§ 851-853.

*Reversed.*

¶ 25. **Reiber, C.J.,** dissenting. The majority decision undermines the ability of the Department to administer the prisons, unnecessarily narrows the trial courts' traditionally wide discretion in determining factual questions, and inserts this Court into the day-to-day management of the prisons. I respectfully dissent.

---

[7] A Hobson's choice is "[a]n apparently free choice that offers no real alternative," after "Thomas Hobson . . . English keeper of a livery stable, from his requirement that customers take either the horse nearest the stable door or none." American Heritage Dictionary 859 (3d ed. 1992).

¶ 26. The principal infirmity in the majority opinion is that it effectively applies a de novo standard of review to the trial court's factual determination that the Department does not intend to punish inmates by imposing the loaf diet. This is contrary to our law and results in appellate fact-finding.[8] Instead, this Court should view the trial court's factual findings in the light most favorable to the prevailing party, and disregard modifying evidence. *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 438, 736 A.2d 780, 783 (1999). "Findings are reviewed for clear error, and will not be disturbed even if contradicted by substantial evidence; rather, an appellant must show that there is *no* credible evidence to support the findings." *Stannard v. Stannard Co.*, 2003 VT 52, ¶ 8, 175 Vt. 549, 830 A.2d 66 (mem.) (emphasis added). Intent, in both the criminal and civil contexts, is a factual question. See *State v. O'Dell*, 2007 VT 34, ¶ 11, 181 Vt. 475, 924 A.2d 87; *Bixler v. Bullard*, 172 Vt. 53, 58, 769 A.2d 690, 694 (2001). By contrast, we affirm legal conclusions if they reflect the correct legal standard and are supported by the findings. *Stannard*, 2003 VT 52, ¶ 8. Finally, and contrary to the majority opinion, this Court traditionally defers to the construction of statutes by the agency charged with implementing them. *State v. Rolfe*, 166 Vt. 1, 7, 686 A.2d 949, 954 (1996).

¶ 27. As noted, the trial court found, as a matter of fact, that the Department does not intend to use the Nutraloaf diet as punishment. There was credible evidence before the trial court that supported this finding, and it must therefore be affirmed. *Stannard*, 2003 VT 52, ¶ 8. Directive 413.09 itself states that its purpose is "to reduce or limit the ability of inmates to misuse bodily waste or food." There was testimony from both the drafter of the directive and from the Department's health services director that the directive was not intended to punish, but rather to prevent. The trial court chose to credit this evidence rather than the inmates' contrary testimony, and this Court should not revisit that choice on appeal. See *State v. Dixon*, 2008 VT 112, ¶ 34, 185 Vt. 92, 967 A.2d 1114.

¶ 28. The majority's answer to this is, in part, that the "trial court did not explicitly find that the Nutraloaf regime was without

---

[8] To cite just one example, the majority refers to Nutraloaf as a "compost" of several ingredients, "mashed together." *Ante*, ¶ 2. Nothing in the record supports this pejorative characterization.

*any* punitive intent." *Ante,* ¶ 15. The trial court's order is to the contrary, however. The court found that "Nutraloaf is . . . not directed as direct punishment," and that "[t]here is no strong evidence in this case that the Department has intended to use the Nutraloaf diet as punishment." Nowhere in the trial court opinion is there a finding that the Department has *any* intent to punish. Finally, the court concluded "that the Department has implemented its Nutraloaf program for legitimate non-punitive purposes." The majority acknowledges these findings, but dismisses them out of hand as evidence of "mixed motives on the part of the Department with regard to the Nutraloaf program." *Id.* As noted, this is directly contrary to the trial court's explicit factual findings. The majority's "mixed motives" characterization, even if true, would not compel reversal, however.

¶ 29. We faced mixed motives, and mixed effects, in *State v. Strong,* and concluded there that the civil suspension of a driver's license was not "punishment" because it could "not fairly be characterized . . . *only* as a deterrent or retribution." 158 Vt. 56, 59, 62, 605 A.2d 510, 512, 514 (1992) (emphasis added and quotation omitted). We explicitly acknowledged that the suspension functioned, in part, as a deterrent: "Although there is an element of deterrence to the summary suspension of an operator's license, this element is present in any loss of license or privilege and is not the primary focus of this statutory scheme." *Id.* at 61, 605 A.2d at 513. We concluded that summary suspension was rationally related to the "purpose of protecting public safety by quickly removing potentially dangerous drivers from the roads," that it was not excessive in relation to that purpose, and that "we must defer to the Legislature in determining the remedial action necessary to achieve its goals." *Id.* Our holding in *Strong* resulted from the straightforward application of familiar, common-sense standards concerning "punishment." Similarly, here, there was no error in the trial court's finding that there was no intent to punish by imposing the Nutraloaf diet.

¶ 30. The majority is incorrect in concluding that the fact that the diet may be discontinued after three days means that it is punitive. Quite the opposite, as is evident in the analogous context of evaluating civil versus criminal contempt. In that context, the fact that a contempt sanction will end upon the contemnor's cessation of the offending behavior weighs in favor of the conclusion that the contempt is *civil,* not criminal, and *coercive,* not

punitive. See, e.g., *In re Sage*, 115 Vt. 516, 517, 66 A.2d 13, 14 (1949). Coercive sanctions may be imposed on the civil contemnor, provided that the contemnor has the present ability to purge himself of contempt by complying with the court's order. *Id.* By contrast, criminal contempt imposes sanctions not to compel compliance with an order, but rather to vindicate the dignity of the court, deter future misbehavior, and punish misconduct. *Russell v. Armitage*, 166 Vt. 392, 407, 697 A.2d 630, 640 (1997) (Morse, J., concurring). Criminal contempt cannot be purged by cessation of the offending behavior. Although the contempt cases do not govern directly, they do highlight the distinction — not made by the majority — between coercion and punishment.

¶ 31. The majority's de novo scrutiny is nowhere more evident than in its analysis of the "principal aim" of the Nutraloaf program. Despite the trial court's plain finding that the diet was not intended to punish, and the support in the record for that finding, the majority concludes that "the principal aim of the Nutraloaf program is to deter." *Ante*, ¶ 16. This is directly contrary to the trial court's finding that "[t]he primary goal of the Nutraloaf program is to limit an inmate's ability to misuse food, utensils, or bodily wastes, by eliminating utensils, [and] by presenting the food in a form that is less messy." As noted, that finding was supported by the record. The trial court was presented with — and apparently chose to credit — evidence supporting the unsurprising notion that inmates are less likely to throw their own bodily wastes if they have to do so with their bare hands. The majority chooses on appeal to discredit this evidence simply because the program may not be perfectly effective as a preventative measure, and because the Department retains some discretion to provide Nutraloaf in different ways to different inmates based on their particular circumstances. The majority's logic today is essentially that prevention cannot be the principal purpose of any program that is not 100% effective.[9]

¶ 32. As we noted in *Conway*, the next step in the inquiry is whether the government decision is reasonably related to a legitimate government purpose. *Conway v. Cumming*, 161 Vt. 113, 119, 636 A.2d 735, 738 (1993) (citing *Bell v. Wolfish*, 441 U.S. 520,

---

[9] Had this logic been applied in *Strong*, we would surely have concluded that summary license suspension — which does not remove the drunk driver's *ability* to reoffend — was punitive. Indeed, it is difficult to imagine any preventative action that could surmount the barrier the majority erects today.

538-39 (1979)). This inquiry, of course, must take account of the "necessarily broad discretionary authority of prison officials over prison administration." *Id.* at 115, 636 A.2d at 736 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977)); see also *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) ("[G]reat deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons."). Further, I note that the Commissioner of Corrections is charged by statute with the responsibility "[t]o maintain security, safety and order at the correctional facilities and act to subdue any disorder . . . which may occur at any facility." 28 V.S.A. § 102(c)(6). The majority, however, does not in any way defer to the Department or acknowledge the discretion that must necessarily inhere for the Department to be able to discharge its weighty responsibility; to the contrary, the majority chooses on appeal to disbelieve the testimony of the very Department officials whom the trial court chose to credit.

¶ 33. The trial court here concluded that "the Department has implemented its Nutraloaf program for legitimate non-punitive purposes." The court also noted, as we did in *Strong*, that there are "punitive aspects" to the program, which arise necessarily out of the Department's need to "avoid creating any incentive for inappropriate behavior." Just as potential drunk drivers might be deterred by the prospect of summary suspension, inmates might be deterred in some measure from inappropriate food-related behavior by the prospect of being served the loaf diet. But we had no difficulty holding, in *Strong*, that summary suspension was not punitive. Indeed, we noted with approval the emerging development of a bright-line rule that such summary suspensions, though they may have incidental deterrent effects, have a generally "nonpunitive purpose" that is "clear and compelling." 158 Vt. at 62, 605 A.2d at 514.[10] So it should be here. The nonpunitive purpose, as the trial court explicitly found, is to prevent inmates from having ready access to vessels in which to store their bodily wastes before throwing those wastes at guards or other prisoners.

---

[10] The majority distinguishes *Strong* on the puzzling basis that "*Strong* was a case involving mixed effects rather than mixed motives." *Ante*, ¶ 16 n.3. The majority today, however, essentially *derives* purported "mixed motives" from the mixed effects of the Nutraloaf regime. Given that mode of analysis, the motives/effects distinction is not a sound basis on which to distinguish *Strong*.

¶ 34. Consistent with our holding in *Strong*, a federal court in Arizona has twice concluded that loaf diets are not "punishment" and, thus, that no hearing is necessary before they are imposed. *Joseph v. Arpaio*, 2008 WL 243690, slip op. at *5 (D. Ariz. 2008) (reasoning that because "nutriloaf" is not punishment, no process was required); *Bugoni v. Coffman*, 2006 WL 3333078, slip op. at **8-9 (D. Ariz. 2006) (concluding that pretrial detainee placed on "nutriloaf" diet for sixty consecutive days, and several months in the aggregate, was not entitled to hearing because diet was not punitive). Petitioners have directed us to no case, and our research reveals none, holding that a nutritionally complete but arguably unappealing prison diet is punishment.[11]

¶ 35. Nor does the fact that Nutraloaf is, according to the inmates who may be served it, no more appealing than standard prison fare require us to reverse the trial court's decision.[12] The Department does not bear the burden of ensuring that the food it provides to excrement-throwing prisoners is precisely as appealing as the food it provides to other inmates. Indeed, the only reliable way to ensure that the special management meals would not be *less* appealing than standard prison food would be to design them to be a great deal *more* appealing than the usual fare. Even that strategy might founder on the shoals of the simple fact that different people have different tastes in food. The need to avoid such an absurd result is precisely why the cases uniformly recognize that nonpunitive measures may have incidentally deterrent effects without being deemed punitive. See, e.g., *Hudson v. United States*, 522 U.S. 93, 102 (1997) (sanction need not be " 'solely' remedial (*i.e.*, entirely nondeterrent)" in order to be deemed nonpunitive); *Strong*, 158 Vt. at 61, 605 A.2d at 513.

¶ 36. It appears that *any* food served pursuant to Directive 413.09 is "punishment" under the majority's analysis, unless such food is designed to be maximally appetizing, or at the very least

---

[11] To the extent that the Eighth Amendment cases cited by the majority, *ante*, ¶ 19, appear to answer the question of whether diets like this one are "punishment," their answers are purest dicta. Those cases, concerned with the question of whether a diet was "cruel and unusual" and therefore prohibited by the Constitution, simply assumed, for purposes of deciding that larger question, that the diet at issue was punitive in some measure. But the question was not squarely raised in those cases, and the majority's reliance on them is unavailing.

[12] The Department had not, at the time of trial, ever served Nutraloaf to any of the plaintiffs.

more appetizing than standard prison food. Any food that is prepared in a manner meant to ensure that inmates do not have an *incentive* to throw excrement at guards will be deemed punitive. For example, the trial court credited the Department's evidence that providing sandwiches would provide an incentive for the very misbehavior the program is intended to prevent. The court explicitly found that, "[a]lthough some of the purposes [of the Nutraloaf diet] could be met by serving sandwiches, the court credits the Department's testimony that the effectiveness of the program would be undermined if the meals were appealing to the point of providing an incentive for misbehavior."

¶ 37. In sum, the Department has decided to serve inmates who misuse bodily waste a meal that is nutritionally complete, easy to prepare, easy to serve without utensils, and that appears to be economical as well. The majority, via appellate fact-finding, deems this meal "punitive" despite an explicit trial court finding — amply supported by the record — to the contrary. Thus the Department faces a Hobson's choice of either providing misbehaving inmates with their choice of foods that are likely *more* appetizing than standard prison fare, thereby encouraging the very behavior that it needs to prevent, or simply doing nothing.[13] I do not believe that the Legislature intended § 851 to have such far-reaching effects.

¶ 38. For that reason, and the others detailed above, I would not reverse the trial court. In doing so, the majority prevents the Department from taking swift, temporary, and entirely unhurtful preventive action against profoundly disruptive and dangerous inmate misbehavior. It is quite clear on this record that punitive deterrence is "not the primary focus" of the regulation, and that the special management meals given to these inmates are, therefore, nonpunitive. *Strong*, 158 Vt. at 61, 605 A.2d at 513. I would affirm.

¶ 39. I am authorized to state that Justice Burgess joins in this dissent.

---

[13] The majority suggests "one rather obvious option — that in response to inmate misconduct, the Department may serve standard prison fare not requiring utensils and trays until guilt is determined at a § 852 hearing after which the Nutraloaf regime may be implemented." *Ante*, ¶ 23. The majority does not — presumably because it cannot — define "standard prison fare," which renders the nature of this option somewhat less than "rather obvious." Indeed, the record is silent as to what the standard fare is in our prisons.