NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 77

No. 2020-274

| | |
|---|---|
| Zachary Rose | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Michael Touchette, Commissioner, | March Term, 2021 |
| Department of Corrections et al. | |

Helen M. Toor, J.

Matthew F. Valerio, Defender General, and Annie Manhardt, Prisoners' Rights Office,
  Montpelier, for Plaintiff-Appellant.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Robert C. Menzel, Jr.,
  Assistant Attorney General, Waterbury, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.    **REIBER, C.J.**    Plaintiff Zachary Rose challenges the decision of the Vermont Department of Corrections (DOC) to terminate him from treatment programming without a hearing.  He argues that his program termination constituted punishment under 28 V.S.A. § 851 and therefore required a hearing and due process under § 852.  The superior court granted summary judgment to DOC, concluding that the termination was not punishment and that plaintiff's claim was not reviewable under Vermont Rule of Civil Procedure 75.  We conclude that DOC's decision is reviewable, but on this record, neither party is entitled to summary judgment.  Accordingly, we reverse and remand.

¶ 2.    The following facts are drawn from the statement of undisputed facts submitted by plaintiff in connection with his motion for summary judgment.[1]  Plaintiff is currently an inmate under the custody and control of DOC.  In 2018, plaintiff enrolled in the Vermont Treatment Program for Sexual Abusers at Northwest State Correctional Facility.  Plaintiff must complete the program to be eligible for release before the end of his maximum sentence.  During a class session in February 2019, when asked to commit to and follow through with something before the next session, plaintiff turned to a classmate and whispered, "escape."  Plaintiff later explained that he was only joking and had no intent to escape.

¶ 3.    A program staff member heard the comment and reported it to prison officials. Northwest State Superintendent Greg Hale ordered that plaintiff be placed in administrative segregation pending an investigation of the incident.  Plaintiff was served notice of an administrative segregation hearing, but a few days later, he was returned to general population.

¶ 4.    Plaintiff then received a Notice of Corrective Action Plan and Removal.  The notice pointed to several program infractions, including being late to group, not completing practice work, misusing group bathroom breaks, and expressing complaints in a non-constructive manner, as well as the escape comment.  Because of his "behavior and statements," Northwest State security officials determined that plaintiff posed a security risk.  Consequently, he was unable to access the facility's programming units and was terminated from the program.  The notice stated that once plaintiff was no longer deemed a security risk, he could re-apply for the program.  As a result of his removal, plaintiff's caseworker added six months to his projected release date. Plaintiff never received a disciplinary report related to his escape comment.

---

[1]  DOC cross-moved for summary judgment but did not respond to plaintiff's statement of undisputed material facts.  Accordingly, we consider plaintiff's statement of facts undisputed for purposes of the motion.  See V.R.C.P. 56(e)(2).

¶ 5.    Shortly thereafter, plaintiff received a program termination letter and was transferred to the Northern State Correctional Facility, where he was placed in general population. Upon intake at Northern State, plaintiff received a Conviction Violation Summary (CVS) score of 3 or "minimum." This score is used to assign a custody level to inmates of minimum, medium, or close. Vermont Department of Corrections Directive 371.04, Custody/Security Assignment in a Correctional Facility [hereinafter Directive 371.04], https://doc.vermont.gov/sites/correct/files/documents/policy/correctional/371.04-Security-and-Custody-Assignment.pdf [https://perma.cc/L9BN-AWTV]. Plaintiff's CVS score was based on his institutional behavior, including his risk of escape. See id.

¶ 6.    Plaintiff submitted an informal complaint seeking to be allowed back into the program. He contended that he had not been found guilty in the investigation following his escape comment and that his placement in minimum security at Northern State showed that he was not considered to pose a security threat. He then filed a formal grievance raising the same issue. The investigating officer reviewed plaintiff's security designation and recommended that his grievance be denied because there was already a plan in place to review plaintiff's designation one year from the date on which he was deemed a security risk.

¶ 7.    Plaintiff appealed the decision to the facilities executive. He filed an additional grievance about a week later, contending that being reviewed one year after his security designation was excessive. Again, based on the one-year review plan, the investigating officer recommended plaintiff's grievance be denied. Plaintiff then appealed the decision to the DOC Commissioner on July 12.

¶ 8.    The facilities executive denied plaintiff's appeal, explaining that plaintiff was removed for "not following multiple [program] expectations" and because of his "security designation for mentioning escape," noting that plaintiff's "actions and comments impacted [his] presence in that part of the institution." Likewise, the Commissioner denied plaintiff's appeal

3

because plaintiff's access to the program units was restricted "due to security concerns after [plaintiff] had mentioned escape," which was "a clear threat to the safety and security of the institution." The Commissioner encouraged plaintiff to return to the program when he became eligible.

¶ 9. Plaintiff filed this appeal for review of governmental action under Civil Rule 75 in the superior court, contending that DOC's decision to remove him from programming was punishment for his escape comment and thus he was entitled to the statutory due process protections under 28 V.S.A. §§ 851-853. Both parties moved for summary judgment.

¶ 10. The superior court granted summary judgment to DOC. The court held that plaintiff's termination from the program did not constitute punishment within the meaning of 28 V.S.A. § 851. The court explained that to determine whether an action was punishment, this Court adopted a test articulated by the United States Supreme Court. See Conway v. Cumming, 161 Vt. 113, 119, 636 A.2d 735, 738 (1993) (adopting test outlined in Bell v. Wolfish, 441 U.S. 520, 538-39 (1979)). Looking to Conway, the court determined that this Court established two prerequisites to the Bell punishment analysis: (1) the alleged punishment must implicate some liberty interest, and (2) the punishment must involve something more than incarceration pursuant to the lawfully imposed sentence. See id. The court reasoned that here, plaintiff failed to establish either prerequisite. The court also distinguished plaintiff's claim from another punishment case, Borden v. Hofmann, because that case did not involve a programming decision. 2009 VT 30, 185 Vt. 486, 974 A.2d 1249. Instead, the court explained that programming decisions are left to DOC's discretion, and thus concluded that DOC's decision to remove plaintiff from programming without bringing a formal disciplinary proceeding was not an "extreme, arbitrary abuse of administrative discretion" warranting Rule 75 review.

¶ 11. On appeal, plaintiff argues the trial court incorrectly concluded that his claim was not reviewable under Rule 75. He contends that Rule 75 review is appropriate because DOC failed

4

to comply with its legal duty to grant him a hearing and formal finding under 28 V.S.A. §§ 851-853 before punishing him. Further, plaintiff challenges the trial court's application of the constitutional due process "prerequisites" from Conway, arguing that the proper inquiry is limited to the test set forth in Bell, 441 U.S. at 538-39. Under this test, plaintiff contends that DOC's decision constituted punishment because, in deeming him a security risk and terminating him from the program, it intended to punish him for joking about escape.

¶ 12. We review summary judgment decisions de novo, applying the same standard as the trial court. In re Barrows, 2007 VT 9, ¶ 5, 181 Vt. 283, 917 A.2d 490. Summary judgment is appropriate if the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. V.R.C.P. 56(a). "In applying this standard, we regard as true all allegations of the nonmoving party supported by admissible evidence and give the nonmoving party the benefit of all reasonable doubts and inferences." King v. Gorczyk, 2003 VT 34, ¶ 7, 175 Vt. 220, 825 A.2d 16.

## I. Rule 75

¶ 13. We begin by addressing whether jurisdiction exists under Rule 75. Rule 75 provides for review of "action or failure or refusal to act by an agency of the state or a political subdivision thereof, including any department, board, commission, or officer, that is not reviewable or appealable under Rule 74." V.R.C.P. 75(a). Rule 75 does not explain which decisions are reviewable but "provides a procedure applicable whenever county court review . . . is available as a matter of general law by proceedings in the nature of certiorari, mandamus, or prohibition." Reporter's Notes, V.R.C.P. 75. Mandamus review is available for allegedly arbitrary abuses of discretion that "amount to a practical refusal to perform a 'certain and clear' legal duty." Inman v. Pallito, 2013 VT 94, ¶ 15, 195 Vt. 218, 87 A.3d 449.

¶ 14. DOC contends that the court lacked jurisdiction to consider plaintiff's claim because programming decisions are not reviewable under Rule 75. See Inman, 2013 VT 94, ¶ 18

5

(holding that "DOC's decision to terminate an inmate from [a] program is not a disciplinary action, but instead a programming decision within its discretion" and therefore not reviewable under Rule 75); Rheaume v. Pallito, 2011 VT 72, ¶¶ 9-11, 190 Vt. 245, 30 A.3d 1263 (affirming that programming decisions are not reviewable for mandamus under Rule 75).

¶ 15.    We disagree.  Plaintiff did not seek review of DOC's decision to remove him from programming, but rather DOC's decision not to grant him a statutorily required hearing before doing so.  Accordingly, this case is distinguishable from Rheaume and Inman, which involved direct challenges to programming decisions.  Here, plaintiff contends that the statute creates a clear legal duty: before being punished, an incarcerated person is entitled to a fact-finding hearing, with the right to notice of the charge, to confront the person bringing the charge, to testify, and to question witnesses.  28 V.S.A. §§ 851-852.

¶ 16.    The availability of mandamus review in this case thus turns on whether DOC's decision was punishment within the meaning of § 851.  If DOC's action constituted punishment, as plaintiff argues, then DOC had a clear legal duty to follow the statutory process under § 852.  Accordingly, plaintiff has established a colorable claim for Rule 75 review.  The fact that plaintiff may not prevail does not bar the Court from reviewing his claim.  See Wool v. Off. of Pro Regul., 2020 VT 44, ¶ 11, 212 Vt. 305, 236 A.3d 1250 (explaining that standing may exist even when claim has no merit).  Because review under Rule 75 is tethered to the merits of plaintiff's claim, the Court has jurisdiction under Rule 75 to consider the claim.

¶ 17.    We emphasize that our conclusion does not entitle every inmate to judicial review simply because they are dissatisfied with a programming decision, even a program termination decision.  See infra, ¶ 29 (rejecting argument that all terminations are punishment).  Absent punitive intent, DOC has authority to administer treatment programs within its "broad discretion" to "determine what mode of treatment best serves individual inmates."  Rheaume, 2011 VT 72, ¶ 11; see also 28 V.S.A. § 102(b)(2), (c)(3), (c)(8).  But DOC's contrary position would insulate

6

every programming decision from judicial review, no matter how clearly the facts indicate that the decision was punitive. This would effectively carve out an exception to § 851 for programming decisions where none appears in the plain language of the statute. See 28 V.S.A. § 851 (providing that "[n]o inmate shall be punished except under the order of" supervising officer or designated deputy, "nor shall any punishment be imposed" except in accordance with statute) (emphasis added)). We cannot agree that DOC's broad statutory authority to administer treatment programs permits it to contravene the clear directive in § 851.

## II. 28 V.S.A. § 851

¶ 18.  We next turn to the merits of plaintiff's claim. Plaintiff argues that the trial court erred in applying the two "prerequisites" from Conway, and instead should only have used the Bell framework in determining whether DOC's program termination was punishment. He then contends that DOC's decision to terminate him from programming was intended to punish him for making an escape joke and therefore constitutes punishment under § 851. We agree that the correct inquiry under § 851 is the Bell test. Under that framework, however, we cannot conclude that either party is entitled to summary judgment. We discuss each issue in turn.

### A.  Legal Framework

¶ 19.  Section 851 provides that "[n]o inmate shall be punished except under the order of the [supervising officer of each facility] or of a deputy designated by him or her for that purpose, nor shall any punishment be imposed otherwise than in accordance with the provisions of this subchapter." 28 V.S.A. § 851. Section 852 requires the committee or hearing officer handling a disciplinary case to conduct a fact-finding hearing pursuant to the statutory procedure and gives the inmate the right to notice, reasonable opportunity to confront the accuser, and the right to testify, among other things. Id. § 852(b). Finally, § 853 sets forth the bounds of permissible punishment if a disciplinary charge is sustained. Id. § 853.

7

¶ 20.    Three key cases inform the legal framework applicable to claims made under § 851. In Bell v. Wolfish, a group of pretrial detainees challenged several conditions of their confinement, arguing in part that these conditions violated the Fifth Amendment of the U.S. Constitution by depriving them of liberty without due process of law.  The U.S. Supreme Court explained that in analyzing this claim, "the proper inquiry is whether those conditions amount to punishment of the detainee."  Bell, 441 U.S. at 535.  This is because the Fifth Amendment prohibits the punishment of detainees before they have been adjudicated guilty in accordance with due process of law. Under certain circumstances, however, a person may be detained before trial to ensure their presence at trial; although such detention restricts a detainee's liberty, it does not constitute punishment if it is merely regulatory.  Id. at 535-37.  To determine whether a condition of confinement is punitive or regulatory, the Court explained that:

> A court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.  Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court may permissibly infer that the purpose of the governmental action is punishment . . . .

Id. at 538-39 (citations, quotation, alterations, and footnotes omitted).

¶ 21.    Bell involved a due process challenge, so it does not apply directly to § 851 claims. But in Conway v. Cumming, this Court adopted the Bell analysis to determine whether an action constitutes punishment under § 851.  161 Vt. at 119, 636 A.2d at 738.  Conway involved an inmate sentenced and committed to the custody of DOC who was granted furlough for short community visits, which DOC later revoked.  The inmate sued, arguing that the revocation of furlough violated

8

his due process rights under the U.S. Constitution, as well as his statutory rights under §§ 851-852. In considering whether the revocation constituted punishment, the Court pointed to three factors laid out in Bell: "(1) whether the intent of the government officials is to punish, (2) whether the purpose of the restriction in question is for some legitimate governmental purpose, and (3) whether the restriction is excessive in relation to its purpose." Id. (citing Bell, 441 U.S. at 538-39). But despite adopting the Bell test in the context of a § 851 claim, the Court did not apply it. Instead, the Court held that (1) the plaintiff did not have a liberty interest in participating in a furlough program, and (2) the plaintiff had not suffered anything other than a continuation of his legally imposed sentence, and therefore had "failed to describe a legal 'punishment.' " Id. In other words, it engaged in a constitutional due process analysis.

¶ 22.     In Borden v. Hofmann, a group of inmates contended that DOC's practice of placing inmates on a diet of Nutraloaf in response to the misuse of food, utensils, or bodily waste constituted punishment under § 851 and therefore required a hearing before DOC could impose the diet. 2009 VT 30. In determining the applicable framework, this Court acknowledged that while Conway adopted the Bell test, it did not actually apply the test in its analysis, and as such was "of limited assistance—except insofar as it identifies the relevant inquiry." Id. ¶ 13. Under the Bell framework, we concluded that placing an inmate on a Nutraloaf diet in response to misconduct was punishment. Id. ¶ 14.

¶ 23.     Here, plaintiff argues that the trial court erred by applying the constitutional due process analysis from Conway as a "prerequisite" to the Bell test, and instead should have only looked to the Bell test. We agree. By stating that Conway was "of limited assistance" except for identifying the Bell analysis as the "relevant inquiry," Borden implicitly rejected the two elements set out in Conway as prerequisites to application of the Bell test to a statutory claim under § 851. Id. ¶ 13.

¶ 24.    Importantly, Borden did not present the question of whether the imposition of a Nutraloaf diet was "a deprivation significant enough to trigger the protection of constitutional due process guarantees." Id. ¶ 1.  By contrast, in Conway, the plaintiff raised a constitutional due process claim as well as a statutory claim under § 851.  The Court analyzed the plaintiff's statutory claim after it concluded that DOC's decision to terminate the plaintiff's furlough status without a hearing did not violate his due process rights.  Conway, 161 Vt. at 116-18, 636 A.2d at 736-38.  In considering the plaintiff's claim under § 851, the Court referred to its due process analysis without engaging in an independent statutory analysis, conflating the two claims without explanation.  See id. at 119, 636 A.2d at 738.

¶ 25.    To the extent that Conway suggested that the procedural protections in 28 V.S.A. §§ 851-853 apply only if an action implicates an inmate's constitutional due process rights, Borden rejected such a conclusion.  By proceeding directly to the Bell analysis, the Court clarified the scope of the inquiry under § 851.  See Borden, 2009 VT 30, ¶¶ 13-14.  Accordingly, we conclude that the proper legal framework applicable to plaintiff's § 851 claim is the Bell test, and the superior court erred by first engaging in a constitutional due process analysis and granting summary judgment to DOC on this basis.  An alleged punishment need not violate an inmate's constitutional due process rights for the statutory protections in §§ 851-853 to apply.  See id.

B.  Application

¶ 26.    We next consider whether plaintiff's program termination was punishment entitling him to the statutory protections in §§ 851-853.  The parties cross-moved for summary judgment, so we must determine whether the undisputed facts entitle either party to judgment as a matter of law.  See V.R.C.P. 56.

¶ 27.    Plaintiff argues that any termination from programming constitutes punishment under § 851.  He notes that the statute allows DOC to impose appropriate punishment in response to a sustained disciplinary charge, see 28 V.S.A. § 852(c), and DOC disciplinary policy lists

10

removal from programming for up to thirty days as an approved sanction, see Vermont Department of Corrections Directive 410.01, Facility Rules and Inmate Discipline 17 [hereinafter Directive 410.01], https://doc.vermont.gov/sites/correct/files/documents/policy/correctional/410.01-facility-rules-and-inmate-discipline.pdf [https://perma.cc/FD78-9HRB]. Plaintiff also points to the program handbook, which lists program termination as a sanction for program violations. According to plaintiff, the fact that DOC <u>could</u> terminate an inmate from a program as punishment for a sustained disciplinary charge and considers termination as a "sanction" for program violations means that all terminations are punishment under § 851. Otherwise, plaintiff argues that DOC can "pick and choose when it will comply" with the statutory process requirements in §§ 851-853. For its part, DOC argues that program termination is within its discretion and is not punishment—unless DOC decides to treat it as such in certain circumstances.

¶ 28. In our view, neither position is tenable. We do not agree with plaintiff's broad proposition that all program terminations are punishment. A participant could be terminated from programming for reasons that do not amount to punishment—for example, if a participant refused to adequately engage in treatment.[2] But on the other hand, DOC's position would give it untethered discretion to employ termination as punishment, inconsistent with the statutory procedural protections in §§ 851-853.

¶ 29. Program termination is not necessarily punishment, but termination may be punishment in some circumstances. Whether a particular action constitutes punishment under § 851 is a legal conclusion based on application of the <u>Bell</u> test, which requires us to examine the circumstances in which the alleged punishment was imposed. See <u>Borden</u>, 2009 VT 30, ¶ 9

---

[2] This was precisely the case in <u>Inman</u>, where the plaintiff was removed from a domestic-violence program based on his behavior, which included " 'justif[ying] his abuse towards his partner and blam[ing] others for his actions' " and program staff's conclusion that he was " 'just going through the motions to get through the program.' " 2013 VT 94, ¶ 6.

(explaining that determination that Nutraloaf diet was punishment under § 851 involved review of trial court's legal conclusions and factual findings).

¶ 30. In each case, courts must first consider whether the facts show punitive intent on the part of government officials. Conway, 161 Vt. at 119, 636 A.2d at 738. Neither Conway nor Bell explain what evidence demonstrates express punitive intent. Generally, intent is a factual determination; in the absence of direct evidence, intent can be proved by circumstantial evidence. See Bell, 441 U.S. at 556 (Marshall, J., dissenting) (arguing that under Bell test, detainees will "bear the substantial burden of establishing punitive intent on the basis of circumstantial evidence or retrospective explanations by detention officials" where motivation behind detention-facility policy is not part of public record); State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) (providing that in criminal context, "[i]ntent is rarely proved by direct evidence; it must be inferred from a person's act and proved by circumstantial evidence).

¶ 31. Borden suggests that evidence that an action or policy is intended to deter misconduct can provide objective evidence of punitive intent.[3] In Borden, the Court explained that " 'retribution and deterrence' are 'traditional aims of punishment.' " 2009 VT 30, ¶ 17 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 (1963)); see also State v. Strong, 158 Vt. 56, 59-60, 605 A.2d 510, 512 (1992) (recognizing deterrence and retribution as punitive government objectives). The Court differentiated between prevention and deterrence, explaining that "[p]revention aims to remove the means to do something, while deterrence, by contrast, aims to convince a person not to do something that they retain the ability to do." Borden, 2009 VT 30, ¶ 16. In considering whether the Nutraloaf diet was punishment, the Court looked to the implementing directive, which had a stated goal of reducing or limiting the misuse of food or bodily waste, rather than actual prevention. Id. The directive "contemplate[d] that the offending

---

[3] We do not read Borden to hold that evidence that an action or policy is intended to deter misconduct shows punitive intent as a matter of law.

12

behavior may continue after imposition of the diet," and directed officials to continue to serve the diet until the inmate stops engaging in the offending conduct.  Id.  Further, the trial court found that the diet was purposefully designed to be unappetizing.  Consequently, the Court concluded that the principal goal of the Nutraloaf program was to deter misbehavior, and thus the diet constituted "classic punitive deterrence."  Id. ¶¶ 16-17.

¶ 32.    If express punitive intent is not shown, the inquiry turns to whether the action was reasonably related to a legitimate government purpose.  Conway, 161 Vt. at 119, 636 A.2d at 738. Bell instructs that "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment."  441 U.S. at 539.  The Court provided this example:

> [L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution.  But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

Id. at 539 n.20; see also Borden, 2009 VT 30, ¶ 18 (noting that existence of "less restrictive means to achieve the preventive ends" of Nutraloaf directive provided further evidence of punitive intent).

¶ 33.    This case does not involve a simple program termination.  Instead, the record reflects that plaintiff was terminated from the program because, following his escape comment, he was classified as a security risk; consequently, he was unable to access the programming facilities and removed from the program.[4]

---

[4] Along with plaintiff's escape comment, the Notice of Corrective Action Plan also pointed to earlier program infractions, like being late to class on two occasions and missing an assignment, in determining that he posed a security risk.  However, the record lacks any evidence indicating that plaintiff would have been deemed a security risk and removed from programing but for the escape comment.  Because the parties do not dispute that plaintiff's escape comment was the operative incident behind DOC's decision to designate plaintiff as a security risk and terminate him from programming, we proceed accordingly.

13

¶ 34. The record shows that after program staff reported plaintiff's escape comment, plaintiff was handcuffed, placed in administrative segregation pending investigation, and given notice of an administrative segregation hearing. As DOC argued, "such a comment is akin to 'joking' about bombs or terrorists in an airport," and its approach demonstrated that DOC took plaintiff's comment seriously and acted to prevent a potential escape.

¶ 35. However, in his grievances, plaintiff consistently maintained that he made a joke and the investigation into his comment uncovered no evidence that he planned or intended to escape. DOC put forth no evidence showing that its investigation found otherwise, and the record contains no evidence contradicting plaintiff's assertions. Instead, the record reflects that DOC moved plaintiff out of administrative segregation before the hearing deadline, placed him back into a general population unit, and "just ruled him too risky to live in a satellite building," leading to his termination from the program for at least one year.

¶ 36. Aside from his inability to access the programming facilities, plaintiff was not otherwise treated as a security risk. He remained in general population in Northwestern State until he was transferred to Northern State. At Northern State, plaintiff was given a CVS score of 3 and assigned a custody level of "minimum," the lowest level; this determination was based in part on his risk of escape. See Directive 371.04. However, Northwest State security officials stated that they would not review plaintiff's security status until one year after the date he was designated as a security risk. When plaintiff filed grievances asking to be readmitted to the program and challenging the one-year review period, other officials used this timeframe as a basis to deny these grievances.

¶ 37. This record lacks clarity regarding several aspects of DOC's decision to classify plaintiff as a security threat and to terminate him from programming. Aside from plaintiff's assertions that he was "cleared," the record contains no evidence about DOC's conclusion following the investigation into his escape comment. Additionally, it is unclear whether, under

14

DOC's security framework, an inmate can be deemed a security risk and prevented from accessing certain facilities—like programming facilities, which according to DOC have a lower level of security—even if the inmate is assigned a custody level of "minimum" under Directive 371.04 and is otherwise unrestricted from accessing other facilities. Further, the record lacks justification as to why plaintiff's security-risk status would not be reviewed for one year.

¶ 38. A fuller development of the facts is necessary to apply the Bell factors in this case. For this reason, we cannot conclude that either party is entitled to judgment as a matter of law. See Provost v. Fletcher Allen Health Care, Inc., 2005 VT 115, ¶ 15, 179 Vt. 545, 890 A.2d 97 (mem.) ("Summary judgment is improper where the evidence is subject to conflicting interpretations . . . ."); PH W. Dover Prop., LLC. V. Lalancette Eng'rs, 2015 VT 48, ¶ 31, 199 Vt. 1, 120 A.3d 1135 (Dooley, J., dissenting) ("If the evidence presented on a motion for summary judgment is subject to conflicting interpretations, or reasonable people might disagree as to its significance, summary judgment is improper." (quotation omitted)). On this record, summary judgment is not warranted.

Reversed and remanded.

FOR THE COURT:

_____
Chief Justice

15