Vermont Superior Court
Filed 03/22/24
Chittenden Unit

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street, PO Box 187
Burlington VT 05402
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 24-CV-00999

---

**Groundworks Collaborative, Inc. et al v. Vermont Agency of Human Services et al**

---

## ENTRY REGARDING MOTION

Title:      Motion for Preliminary Injunction; Motion for Preliminary Injunction; Motion for Class Certification; (Motion: 3; 6; 8)

Filer:      Sandra L. Paritz; Maryellen Griffin; Sandra L. Paritz

Filed Date:      March 15, 2024; March 18, 2024; March 19, 2024

This case involves claims that Defendants have failed to comply with recently-passed legislation requiring them to provide temporary housing for individuals who qualify for various types of state assistance. Plaintiffs include three individual plaintiffs and several organizations that assist those who are homeless. They seek a preliminary injunction directing immediate action by Defendants to provide temporary housing to certain categories of individuals. The court previously denied a temporary restraining order sought by the organizational plaintiffs, but granted one in favor of the three named individual plaintiffs. A hearing was held yesterday on the motions for a preliminary injunction. The parties agreed to rely on the affidavits already filed and a brief video clip played at the hearing.

### Relevant Facts

In the interest of time, the court will not discuss the facts at length, as they are not greatly disputed and the real question before the court is a legal one. The basic issue here relates to the meaning of the Budget Adjustment Act, passed on March 1 but not

signed by Governor Scott until March 13. H. 839, § 89. It directed, as discussed at greater length below, that the Commissioner for Children and Families (hereinafter DCF) "ensure" temporal housing for certain categories of propel through June 30 of this year. It also stated a preference for shelters rather than hotels/motels. The categories of individuals covered by the law included those eligible for housing under several different and somewhat confusing authorizations. Some related to weather, some to qualification for general assistance, some to age or disabilities. The factor that became key to this case was the Adverse Weather Conditions (AWC) policy that had provided for housing through the winter, until March 15.

In preparing for the legislation to go into effect, DCF made the decision not to extend the AWC to pay for motels beyond March 15. People could still qualify on a night-by-night basis on cold nights, or due to other qualifications such as age or disability, but they would have to reapply for those categories. DCF sent notices to the relevant hotels/motels advising them about all of this on March 12, and asked them to convey that information to residents housed by DCF. DCF staff also went to at least some of the motels on March 14 to try to speak directly with participants, and left flyers with information for those they did not find at home. Tousignant Declaration, ¶ 42. DCF also set up at the last minute four shelters around the state where cots were available overnight. On the morning of March 15, they called all the motels to share the shelter information and asked that the staff share that information with residents.

Letters were also sent to the individuals, but not until March 14, too late to reach them before they had to check out of motels. Organizations such as the organizational plaintiffs were also told what DCF was planning—but all of this occurred in the last few

days before March 15. The timeline made it impossible to reach all the people who were losing their AWC housing on March 15. Many ended up leaving the motels and not knowing about the shelters or other next steps.

The Act also greatly eased the requirements for individuals with disabilities to obtain housing through DCF, no longer requiring proof of receipt of SSI or SSDI. The Act said that instead of such proof an applicant could "use the Department's Emergency Housing Disability Variance Request Form" to document their disability. Id. § 89(b). That form was no longer in use by DCF, but the outdated version of that form (Exhibit 10) did not require a signature from anyone other than the applicant. DCF was concerned about abuse of the system by people without actual medical needs, and edited the form to require a doctor, nurse or social worker to sign saying the person had a disability.  Exhibit 11. That form, however, was not provided to the organizational plaintiffs until March 13.

The individual plaintiffs here were not aware that they could ask to stay in their motels under different qualifications beyond the AWD, and left the motels on March 15. Ms. Parent had never been approved to stay by DCF, but was staying with Mr. Trouble. Mr. Trouble would have qualified to stay because of his age and because he receives SSI. The two of them spent two nights sleeping on the streets. Mr. Flannery has COPD and requires electricity to power his supplemental oxygen for much of the day. Despite the March 15 deadline for his stay at a motel under the AWD policy, the motel generously allowed him to stay for the weekend because of his medical condition. All three have now been approved for motel housing.

The organizational plaintiffs have engaged in a major effort in recent days to locate those in need of housing who qualify under the Act. Given the short time frame and last-minute nature of the information provided by DCF, they were not able to reach everyone previously in motels to help them apply for continued housing after March 15. According to DCF, 371 individuals in 347 households left the motels on March 15 due to the end of the AWD policy, but as of the morning of March 20, more than half—172 individuals in 157 households—had been approved for housing under the new disability variance form.

There is strong evidence that those experiencing homelessness "are at greater risk of a broad range of adverse health outcomes," including a higher risk of death, suicide fatal overdose, and violence. Affirmation of Anne Sosin, ¶ 3.

Discussion

A preliminary injunction is "an extraordinary remedy never awarded as of right." Taylor v. Town of Cabot, 2017 VT 92, ¶ 19, 205 Vt. 586, quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain such an injunction, plaintiffs must establish both that there is a threat of irreparable harm and that they are likely to succeed at trial on the merits of the case. Id. If those elements are established, the court must also consider the potential harm to other parties and the public interest. Id. The burden of proof is on the party seeking the injunction. It may not be granted "unless the right to relief is clear." Comm. to Save the Bishop's House v. Med. Ctr. Hosp. of Vermont, Inc., 136 Vt. 213, 218 (1978).

## Irreparable Harm

As the court has previously held, losing one's housing—whether temporary or permanent—meets the standard for irreparable harm. *See* Duprey v. Samuelson, 23-CV-2299 at 14 (Vt. Super. June 1, 2023) (Tomasi, J.) ("The Court agrees that removing persons from their rightful homes and subjecting them to homelessness is an irreparable harm."); Hagan v. City of Barre, No. 320-5-09 Wncv at 9 (Vt. Super. June 29, 2009) (Toor, J.) ("As other courts have found, this court concludes that forced homelessness and the likely loss of housing benefits under Section 8 would meet the legal test for irreparable harm.") (citing cases); *accord*, Campbell Inns, Inc. v. Banholzer, Turnure & Co., Inc., 148 Vt. 1, 7 (1987) (losing one's livelihood can constitute irreparable harm, because it is more than just a financial loss). This is particularly true in winter in Vermont, and when the people in question are those suffering from disabilities such as the need for supplemental oxygen. The individual plaintiffs certainly satisfy this criterion.

However, the court cannot conclude that the non-profit plaintiffs will suffer the same harm. They are no doubt frustrated, overworked due to this chaotic situation, anxious about their clients, and having to set aside other tasks to try to house those vulnerable individuals recently shut out of motels, but the evidence does not suggest that these factors meet the test for irreparable harm to the organizations. Courts have held that a forced significant change in an organization's programs can constitute irreparable harm. *See, e.g.*, E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 678 (9th Cir. 2021) ("We agree with the district court that the Organizations have established that they will suffer a significant change in their programs and a concomitant loss of funding

absent a preliminary injunction enjoining enforcement of the Rule. Both constitute irreparable injuries[.]"); <u>Downtown Soup Kitchen v. Municipality of Anchorage</u>, 406 F. Supp. 3d 776, 797 (D. Alaska 2019)("Hope Center has established a sufficient likelihood of irreparable harm resulting from restrictions on Hope Center's ability to provide overnight living space to homeless persons."). However, the harm alleged here is not so severe. A temporary diversion of resources, as opposed to a forced change in an organization's core mission, is not sufficient to establish irreparable harm.

<u>Likelihood of Success</u>

The sole claim here is that Defendants are violating the Budget Adjustment Act passed this month (the Act). That required in relevant part as follows:

> To the extent emergency housing is available, the Commissioner for Children & Families shall ensure that temporary emergency housing is provided through June 30, 2024 to households eligible for the General Assistance Emergency Housing Program, including beneficiaries of the emergency housing transition benefit that is set to conclude on April 1, 2024 and including those individuals who qualify for temporary emergency housing pursuant to both the Department's adverse weather condition policy and either catastrophic or vulnerable population eligibility.

H. 389 § 89(a). Plaintiffs' position is that this required DCF to keep housing those in motels at the time the law went into effect. DCF's position is that the law was not so specific, and allowed the approach the agency has taken: creating emergency congregate shelters and assessing anyone who requests motel shelter as usual to determine whether they qualify. That includes both those who were previously in motels and new applicants for housing who meet the definitions in the Act.

DCF explains that its approach was driven by various factors, including a lack of clarity as to whether the Governor would sign the law (he did not do so until March 13),

funding running out for the motels as of March 15, and the fact that there are typically not enough motel rooms available to house all those who qualify. The March 15 deadline was one set by DCF policy, however, and DCF's counsel did not dispute reports that the emergency shelters are costing more than the motels would have cost for the same number of people. They also do not allow people to stay during the day, and do not provide storage or showers. DCF also did not explain why the same funds used for emergency shelters could not have been used to pay for motel rooms. Although DCF made significant efforts to inform motel residents and operators of its plans, including the location of the shelters, those efforts appear to have failed with regard to numerus motel residents including the named individual plaintiffs. Many residents thus apparently ended up on the street, though many have since sought, and been approved for, motel housing.

The parties agree that the legal claim here is one for mandamus. "Mandamus is a command from the court to an official, agency, or lower tribunal to perform a simple and definite ministerial duty imposed by law." Island Indus., LLC v. Town of Grand Isle, 2021 VT 49, ¶ 21, 215 Vt. 162 (quoting Wool v. Office of Prof'l Regulation, 2020 VT 44, ¶ 18, 212 Vt 305). It cannot issue if the matter is one in which the agency is exercising discretion, unless that discretion has been abused. Id.; Rose v. Touchette, 2021 VT 77, ¶ 13, 215 Vt. 555 ("Mandamus review is available for allegedly arbitrary abuses of discretion that amount to a practical refusal to perform a certain and clear legal duty.") (quotations and citation omitted). "A writ of mandamus can enforce the performance of only existing duties. It can neither create new duties nor require of a public officer more

than the law has made it his [or her] duty to do." Rheaume v. Pallito, 2011 VT 72, ¶ 7, 190 Vt. 245 (quoting Grout v. Gates, 97 Vt. 434, 453 (1924)).

The Act required DCF to "ensure that temporary housing is provided" to various categories of individuals, but it did not specify precisely how to do that. It did not say that DCF was required to keep *existing* motel residents in motels beyond March 15. To the contrary, it said:

> Temporary emergency housing . . . may be provided through approved shelters, new unit generation, open units, licensed hotels or motels, or other appropriate shelter space. *The Agency of Human Services shall, when available, prioritize temporary emergency housing at housing or shelter placements other than licensed hotels or motels.*

H. 389 § 89(c) (emphasis added). DCF had discretion to determine how to meet the requirements to provide housing. It decided to use its usual process of requiring people to re-up when their authorizations ended (here March 15) by reaching out to DCF, rather than keeping everyone where they were while assessing their qualifications for a different category of housing approval. Nonetheless, DCF staff also went to at least some of the motels on March 14 to try to speak directly with participants, and left flyers with information for those they did not find at home.

The one aspect of DCF's actions that was arguably in clear violation of the Act was the creation of a different form for applications based upon disability. The Act referred to a specific form by its title, and while it was an outdated form that had not been in current use, it was expressly identified by name the law. By changing that form to add an additional step—a signature from a medical professional—DCF appears to have acted in violation of the language of the law. However, there is no evidence currently before the court that the change in the form has itself caused any individuals to be denied or

delayed housing. Thus, on the current record there is no irreparable harm that has flowed from this change.

While Plaintiff organizations and the court might have made other choices about how to apply the Act's other directives, the court cannot say that Plaintiffs are likely to succeed on the claim that DCF's approach was arbitrary or capricious. The fact that there were other options, even much better options, does not mean an agency's choice is arbitrary. *See, e.g.*, State of Fla. v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1291 (11th Cir. 2021) ("Even if we were to agree . . . that these other options were preferable . . . this would not come close to showing that the district court erred in concluding that the Secretary's decision was not arbitrary or capricious."). If the legislature intended that everyone stay where they were while being assessed for alternate criteria, they could have so specified. DCF's approach was one possible interpretation of the law as written. This is particularly true given the directive in the statute to prioritize shelters over motels. Under these circumstances, the court cannot use its mandamus power.

It appears to the court, however, that the current approach to homelessness in Vermont is an overly complicated bureaucratic and financial maze. The sort of chaos created here by the last-minute legislative changes—for all of the plaintiffs and other motel residents, but also for hardworking DCF staff—cannot be the best way to manage the problem. One would have to be blind and isolated from the news not to acknowledge that homelessness, and its companion issues of mental health, trauma, and substance abuse, are a crisis that must be better addressed. There are many people working hard on these issues, including many on both sides of this case. It would seem that DCF and organizations around the state such as the plaintiff organizations, all of whom

presumably have the same ultimate goals, could work together to design a big-picture approach to the problem rather than continuing to cobble together short-term solutions while in crisis mode.

## Class Certification

It appears that this ruling may dispose of the whole case, as the primary relief requested was tailored to what was happening prior to March 15. If that is the case, the motion to certify a class is moot. In any case, Plaintiffs are entitled to file a reply memo on that motion if they do wish to proceed. The court therefore defers any ruling on that motion at this time.

## Order

The motions for a preliminary injunction are denied. The court requests that Plaintiffs advise the court within 14 days if they intend to proceed further with the case, or whether a final judgment should issue.

Electronically signed on March 22, 2024 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge