VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      22-AP-087

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

DECEMBER TERM,   2022

Nathaniel Hendricks v. Martin Heck\*

}  APPEALED FROM:
}  Superior Court, Windham Unit,
}  Family Division
}  CASE NO. 21-DM-02412
   Trial Judge: Katherine A. Hayes

In the above-entitled cause, the Clerk will enter:

Defendant appeals the family division's order, following a trial, granting plaintiff an annulment of the parties' marriage.  Defendant argues, among other things, that the family division lacked jurisdiction because neither party was a Vermont resident and that the court's finding that defendant induced plaintiff into the marriage by coercion was not supported by sufficient evidence.  We affirm.

After a final merits hearing held over the course of several days in January 2022, where plaintiff appeared with counsel and defendant represented himself, the family division made the following findings and conclusions.  Plaintiff was 84 years old at the time of trial and is in somewhat poor health.  He has mild dementia.  At the time of the hearings, plaintiff was staying with his adult son in Cold Spring, New York.  Although plaintiff has lived in Putney, Vermont for most of his life, and owns two homes there, he also owns properties in other locations, including Nova Scotia, West Virginia, and Troupsburg, New York.

Since 2016, plaintiff has been living primarily at his home in Troupsburg, New York in order to recover from major surgery and protect his health during the COVID-19 pandemic.  In 2016 plaintiff suffered a severe heart attack while attending a conference in Williamsport, Pennsylvania and required extensive surgery.  Because his Troupsburg home is located near his Pennsylvania medical providers, he decided to stay there to recover and obtain follow-up medical care.  When the pandemic began in the spring of 2020, plaintiff decided to remain at his New York residence until the pandemic was over.  The court credited plaintiff's testimony that he did not feel safe returning to Putney in part due to the pandemic, and that he chose to stay in Troupsburg because it was "way out in the hills" and felt safe during the public health crisis.  He has no plans to remain in Troupsburg permanently and intends to return to living full-time in Vermont as soon as this case is resolved.

Plaintiff manifested this intent in numerous ways.  He pays taxes on both of his residences in Putney, Vermont.  He maintains a post office box address in Putney, where he

receives his mail, including credit card bills and social security benefits. Plaintiff is registered to vote in Vermont and voted there in 2020. He owns two cars, both of which are registered in Vermont. His driver's license is from the State of Vermont and was valid at the time of the hearing. Several members of plaintiff's extended family live in the Putney area, and he spent time with his family in Putney over the Christmas holidays in 2021. Plaintiff has spent most of his life living in Putney and he considers Vermont his home.

Plaintiff met defendant in 2019, through their mutual efforts to prevent the closure of Marlboro College, located in Marlboro, Vermont. Plaintiff was concerned about its possible closure because his family were among the founders of the college, and defendant was also concerned about this issue. They began talking on the phone and corresponding about the future of the college, and thereby became friends. Defendant created a fund to save the college, and plaintiff contributed to it.

In 2021, defendant visited plaintiff at his home in Troupsburg, New York. Not long afterward, in the summer of 2021, defendant moved into the home and was still living there at the time of trial. Shortly after moving in, defendant contacted a Vermont lawyer on behalf of plaintiff and arranged for plaintiff to meet with that attorney in Rutland, Vermont. The attorney prepared a power of attorney and advance directive giving defendant the authority to make decisions for plaintiff if he were incapacitated. Plaintiff signed those documents at the attorney's office in June 2021.

In August 2021 a marriage license was issued to plaintiff and defendant in Putney, and few days later, they were married by a justice of the peace in Putney. Both parties stated that they were residents of Putney on the marriage license and certificate. These documents also stated the parties' respective ages, showing that defendant is 21 years younger than plaintiff. Despite the marriage, the parties' relationship was never romantic, intimate, or sexual in any way.

The court credited plaintiff's testimony that he never wanted defendant to move into his home and that defendant took actions to isolate him from his friends and family. In particular, defendant told plaintiff not to talk to his son or his old friend, Lonnie Coplen. Defendant admitted in his testimony that he put sticky notes around the house and on the telephone reminding plaintiff not to call his son or Ms. Coplen. Plaintiff did not feel comfortable opposing defendant's demands.

Several witnesses testified to unusual and suspicious circumstances surrounding the parties' relationship. Ms. Coplen testified that she had been friends with plaintiff since 2014 and they often talked on the phone. He typically called her, not the other way around. At some point, plaintiff told her that he had met a friend in connection with efforts to keep Marlboro College open, but she did not know defendant had moved in until she visited plaintiff at his house a few times in the summer of 2021. During those visits, she perceived defendant as "towering over" plaintiff and hovering around him. Defendant is much taller than plaintiff and more physically fit. Until mid-summer 2021, Ms. Coplen and plaintiff spoke on the phone almost daily, and then plaintiff suddenly stopped calling. A few weeks later, she received a call from another friend of plaintiff's, who urged her to contact plaintiff's son because of concerns about plaintiff's wellbeing.

In August 2021, Ms. Coplen drove to Troupsburg to see plaintiff. When she arrived, plaintiff asked her to take him to dinner alone, despite that defendant was also present. Defendant appeared angry about this decision. When they left the house, plaintiff told Ms. Coplen he was afraid of defendant, that defendant was a drinker, and that he had a gun at the house. At that point it was late evening, so Ms. Coplen planned to drop off plaintiff at his house, then return the next morning to pick him up so that he could leave Troupsburg and get away from defendant. But when she returned the next day, plaintiff and defendant were gone. Ms. Coplen notified plaintiff's son about what plaintiff had told her. She continued to call plaintiff over the next several weeks, but he never picked up or returned her calls.

Valerie Foti was a friend and home care provider for plaintiff. Ms. Foti and plaintiff saw each other regularly during the first half of 2021, with plaintiff often driving to her home in Troupsburg to say hello. When he did not stop by for a few weeks, she drove to his house to check on him and discovered defendant there. Defendant asked her if she could begin providing home care for plaintiff. She began going to the house to clean and keep plaintiff company while defendant "managed his financial affairs." During one visit, plaintiff told Ms. Foti that defendant wanted them to get married to protect his financial assets, but said he did not want to do so. She observed that defendant spent a lot of energy organizing things at plaintiff's house but not much energy caring for plaintiff himself. Defendant told Ms. Foti that his marriage to plaintiff was "a marriage of convenience," intended to allow defendant to help plaintiff. Ms. Foti never observed defendant show any physical affection for plaintiff.

Plaintiff's son grew up in England and did not know who his biological father was until he identified plaintiff through research in 2000. The son contacted plaintiff, plaintiff acknowledged the relationship, and from then on, they maintained a close familial relationship. Up until mid-2021, plaintiff and his son spoke on the phone every couple of weeks and usually spent major holidays together. Around May or June of 2021, plaintiff stopped calling his son and did not return calls or messages. After Ms. Coplen informed the son of her concerns about plaintiff and what had happened during her visit, the son called plaintiff the next day. Plaintiff said he was driving and would call back, but he never did. The next day, an attorney's office sent the son an email stating that all his communications with plaintiff should go through the attorney. Although the son replied asking the attorney to allow him to speak to plaintiff, the attorney did not set up any such conversation.

In early September 2021, having heard a rumor that plaintiff and defendant might be planning to get married in Putney, plaintiff's son, the son's wife, Ms. Coplen, and one of plaintiff's nephews drove to Troupsburg to try to meet with plaintiff. When they arrived, defendant came outside with his phone and said he was trying to reach his attorney. They asked to speak to plaintiff. Plaintiff came outside and seemed somewhat "sheepish" but was happy to see them. Although the family talked with plaintiff for over an hour, they were never invited inside. Plaintiff asked if they could all go to lunch, and defendant said, "who talked you into that?" At that point, plaintiff and defendant went into the house, and the visitors could see defendant gesticulating and talking to plaintiff. A few minutes later, plaintiff came outside and said he was too tired to go to lunch. The visitors then left.

About a week later, plaintiff's son was on a business trip in Europe when he received a late-night call from plaintiff and Ms. Foti. Plaintiff said that he had escaped, that he wanted the marriage annulled, and that he did not want anything to do with defendant. The son arranged for

3

plaintiff to stay overnight in a hotel and for plaintiff's nephew to pick him up the next day and bring him to the son's home in Cold Spring. The plan was successfully executed, and plaintiff has been staying with his son in Cold Spring since that time.

Plaintiff confirmed the events described by his son and Ms. Coplen in his own testimony. The court also credited plaintiff's testimony that he signed the power of attorney and advance directive for health care only because defendant insisted on it, and plaintiff did not want to do so. Plaintiff was uncomfortable because of defendant's insistence that he not call family or friends and did not feel safe saying anything to oppose defendant. He was afraid that if he defied defendant, defendant would kill him.

Defendant testified that his actions were motivated by a desire to care for and protect the plaintiff. The court found credible defendant's testimony that he arranged for some assistance for plaintiff, including securing a visiting nurse; that he took defendant to medical appointments and made sure he took medication; and that he arranged for the home to be cleaned and garbage to be removed. Defendant never paid rent and plaintiff paid for most of their food while they were in Troupsburg together.

Plaintiff brought this annulment action in October 2021 once he had left his home in Troupsburg and began staying with his son. Plaintiff requested that the court award no property or maintenance to defendant and issue a civil restraining order barring defendant from contacting him. Defendant opposed the annulment. He challenged the court's jurisdiction, arguing that neither party was a Vermont resident as required by 15 V.S.A. § 592. He also challenged the merits of the annulment petition, insisting that he did nothing wrong. He acknowledged that his relationship with plaintiff was never romantic or sexual but asserted that he liked plaintiff and wanted what was best for him. Defendant asserted that plaintiff told him he did not want his family involved in his life because he feared they would challenge his competency and interfere with his life and his choices, and plaintiff therefore asked defendant to arrange the necessary legal assistance to protect plaintiff from his family. Defendant sought to be granted continued occupancy of the Troupsburg home and to be awarded half of the marital assets as well as a sum for attorney's fees.

The court rejected all of defendant's arguments and annulled the marriage. The court concluded that it had jurisdiction because plaintiff maintained his status as a Vermont resident at all relevant times. It found that plaintiff was a Vermont resident prior to 2016, and that his absence from the state after that time was temporary and due to unforeseen circumstances, including a heart attack requiring major surgery and a global pandemic. The court also concluded that the standard for annulment was met because the evidence demonstrated that defendant coerced or deceived plaintiff into marrying him. The court noted plaintiff's age and mental weakness, defendant's constant supervision and actions to isolate plaintiff from friends and family, and the suspicious circumstances surrounding the marriage, including defendant's prior legal arrangements which gave defendant some control over plaintiff and his property. Finally, the court concluded that defendant was not entitled to any award of property because by statute an annulment means that there are no marital assets to be divided. The court issued a final decree of nullity and did not award costs or attorney's fees.

On appeal, defendant renews his jurisdictional argument and his challenge to the sufficiency of the evidence. He also asserts that the court abused its discretion in various rulings prior to and during trial, which resulted in prejudice to defendant.

4

The legal standard conferring jurisdiction on the family division to consider annulment petitions is well-established. Pursuant to 15 V.S.A. § 592(a):

> A complaint for . . . annulment of civil marriage may be brought if either party to the marriage has <u>resided</u> within the State for a period of six months or more. . . . Temporary absence from the State because of illness, employment without the State, service as a member of the U.S. Armed Forces, or other legitimate and bona fide cause shall not affect the six months' period . . . , provided the person has otherwise retained residence in this State.

(Emphasis added.)

"The concept of residency in a divorce proceeding is encompassed within the legal definition of domicile: an abode <u>animo manendi</u>, a place where a person lives or has his home, to which, when absent, he intends to return and from which he has no present purpose to depart." <u>Duval v. Duval</u>, 149 Vt. 506, 509 (1988), overruled on other grounds by <u>Shute v. Shute</u>, 158 Vt. 242 (1992) (quotation omitted). "To change domicile, there must be a relocation to the new residence and continued dwelling there, coupled with an intention of remaining there indefinitely; neither physical presence alone nor intention alone is sufficient to effectuate a change of domicile." <u>Conley v. Crisafulli</u>, 2010 VT 38, ¶ 6, 188 Vt. 11 (quotation omitted). We have clarified that "an essential ingredient of the intent to acquire a new domicile is the intent to give up the old domicile." <u>Id</u>. (quotation and alteration omitted). This Court has noted that the place where a person has his driver's license, registration, property, and job are all factors to consider in assessing domicile. <u>Id</u>. ¶ 9.

"In Vermont, domicile is a question of fact." <u>Id</u>. ¶ 4. This Court will not set aside findings of fact unless clearly erroneous, and we will defer to the trial court's assessments regarding credibility and weight of the evidence. <u>Id</u>. Here, defendant's challenge to the trial court's subject matter jurisdiction presents primarily questions of fact. He generally disagrees with the court's evaluation of evidence and its findings regarding plaintiff's domicile, rather than its interpretation of the statute or case law. To the extent he argues that the trial court applied the wrong standard or misapplied the law, we review these issues de novo. <u>Louko v. McDonald</u>, 2011 VT 33, ¶ 7, 189 Vt. 426.

Defendant argues that although the trial court stated it was an undisputed fact that plaintiff was a Vermont resident prior to his heart attack in 2016, the record was unclear on this point. He cites to plaintiff's testimony that he used to live in Cragsmoor, New York. But plaintiff merely answered "Yes" to the question, "Have you ever lived in Cragsmoor, New York?" There is no further testimony on this point and thus no evidence of when or for how long plaintiff lived at that location. Defendant also relies on the trial court's acknowledgement at the outset of trial that "the complaint says [plaintiff] resides in Cold Springs, New York." These statements do not establish that plaintiff was ever a legal resident of New York for purposes of the annulment statute. The court found based on plaintiff's testimony, and defendant does not dispute, that plaintiff lived in Putney, Vermont for most of his life.

The court also found that plaintiff owns two residences in Vermont, has maintained car and voter registrations here, and has continued to vote here. We note additionally that the parties' marriage license, obtained less than two months before plaintiff filed this annulment

action, listed both parties as Vermont residents. And plaintiff continued to receive important mail at his Vermont address, including credit card bills and social security benefits. There was no evidence of plaintiff taking similar actions in New York or any other state. See Conley, 2010 VT 38, ¶ 6 (noting that "physical presence alone . . . is [not] sufficient to effect a change of domicile"). Although defendant asserts that plaintiff had a post office box in New York too, he cites no record evidence to support this claim; nor does he cite evidence explaining when and to what extent, if at all, plaintiff has used this New York address. There was ample evidence to support the court's findings that plaintiff was a resident of Vermont at the time he filed the annulment action.

Credibility appropriately played a crucial role in the court's analysis of domicile. See id. ¶ 8 (explaining that domicile "deals not only with acts, but with states of mind" and that "intent may be proven by the acts as well as the words of the person involved" (quotations omitted)). The family division found genuine and credible plaintiff's testimony that Vermont is his home and that he intends to return to Vermont when the pandemic is over, and this case has concluded. Although plaintiff has been living primarily in New York for several years now, the unique circumstances of suffering a sudden, major heart attack while away from home, and needing extensive follow-up care, followed by a global pandemic lasting multiple years, support the credibility of plaintiff's statements. Defendant points to certain evidence to cast doubt on the legitimacy of plaintiff's health and safety concerns as reasons for staying in New York, but such arguments bear on credibility or the weight of evidence, and we therefore reject them. See Cabot v. Cabot, 166 Vt. 485, 497 (1997) ("As the trier of fact, it was the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence."). Defendant also points to evidence that plaintiff turned off the heat and electricity at his Putney homes and stayed with relatives or at a hotel when he visited Putney in recent years, which, according to defendant, shows that plaintiff does not truly intend to move back to Vermont. This argument goes to the weight of evidence, so we reject it as well. See id. Because there was credible evidence to support the trial court's findings regarding domicile, we uphold them.

To the extent defendant argues that plaintiff could not be considered a resident of Vermont because he does not physically reside there currently, we disagree. The statute and case law establish that even extended absences from the state may not result in a change of domicile if the record evidence shows that the person maintained a genuine and clear intent to return. See 15 V.S.A. § 592(a) ("Temporary absence from the State because of illness . . . or other legitimate and bona fide cause shall not affect the six months' period . . . , provided the person has otherwise retained residence in this State."); Duval, 149 Vt. at 509 (noting legal definition of domicile is "place where a person lives or has his home, to which, when absent, he intends to return"). Given plaintiff's actions demonstrating ties to Vermont, the lack of any similar actions taken in New York or other jurisdictions, and the unique circumstances that forced plaintiff away from Vermont—where he undisputedly has lived for most of his life—we see no error in the court's findings or conclusions regarding residency.

We turn now to defendant's challenge to the sufficiency of evidence and findings bearing on annulment. "When findings are challenged on appeal, our role is limited to determining if they are fairly and reasonably supported by credible evidence." Lanfear v. Ruggerio, 2020 VT 84, ¶ 16, 213 Vt. 322. The trial court's conclusion regarding annulment will stand if supported by its findings. Semprebon v. Semprebon, 157 Vt. 209, 214 (1991).

6

"A civil marriage may be annulled . . . on the ground that the consent of one of the parties was obtained by force or fraud, or the threat of force, or other forms of coercion or deception on the complaint of the party whose consent was so obtained . . . ." 15 V.S.A. § 516. In its analysis under this statute, the trial court looked to evidence of plaintiff's state of mind at the time of the marriage and how defendant's actions may have affected plaintiff's state of mind. Defendant agrees that this inquiry was proper but argues that plaintiff's testimony regarding his willingness to enter into the marriage was not credible and that defendant's testimony to the contrary was credible. We reject these arguments because assessing credibility is exclusively within the trial court's purview. Mullin v. Phelps, 162 Vt. 250, 261 (1994) (role of Supreme Court in reviewing findings of fact is not to reweigh evidence or to make determinations of credibility de novo)

Defendant also contends that there was not sufficient evidence of any fraud, threats, or coercion occurring before the marriage. We disagree. Plaintiff testified, and the court found credible, that before the marriage defendant moved into his house against plaintiff's wishes and came up with and executed a plan for plaintiff to sign legal documents to give defendant control over plaintiff's legal and health affairs. The court also credited plaintiff's testimony that he did not feel safe opposing defendant's demands. Multiple witnesses testified to events both before and after the marriage where defendant attempted to prevent plaintiff from communicating or visiting with friends and family. One witness, Ms. Foti, testified that defendant appeared to loom over plaintiff and physically hover around him. The court concluded that plaintiff was unable to voluntarily consent to the marriage because of defendant's controlling behavior and plaintiff's advanced age and physical and mental weakness. The court's conclusion regarding annulment was couched in numerous relevant factual findings, which in turn were well-supported by record evidence. Accordingly, there is no basis to disturb the court's decision.

Defendant next argues that the trial court committed reversible error by declining to evaluate plaintiff's ability to pay an attorney's fee award at the outset of trial. He contends that because of this alleged error, defendant was unable to afford counsel and thus was at a disadvantage in the litigation. We reject these arguments for several reasons. First, we do not require a separate hearing regarding attorney's fees in divorce matters, and fee awards are routinely made, if at all, as part of the court's final order following the merits hearing. See, e.g., Willey v. Willey, 2006 VT 106, ¶ 25, 180 Vt. 421 ("[W]e do not require the family court to conduct a separate hearing and take additional evidence about the relative financial positions of the parties because those positions have typically been subject to extensive judicial scrutiny during the hearing on the merits."); Phelps, 162 Vt. at 268-69 (affirming trial court's award of attorney's fees included as part of final order after merits hearing); Adams v. Adams, 2005 VT 4, ¶ 1, 177 Vt. 448 (same). Thus, the court committed no error in delaying consideration of a fee award until after trial.

Second, defendant's argument presumes that he would have been entitled to an award of attorney's fees, but, strangely, he does not contend that the trial court erred in its ultimate decision not to award him attorney's fees. Indeed, he points to no facts supporting such an award other than a suggestion that plaintiff had the financial means to pay. Generally, "[a]ttorney's fees are recoverable in a divorce action in the form of 'suit money.' " Downs v. Downs, 159 Vt. 467, 471 (1993) (quoting 15 V.S.A. §§ 606, 607). The trial court may award attorney's fees in its discretion based on equity and the ability to pay. Willey, 2006 VT 106, ¶ 26. We review these decisions for abuse of discretion. Cleverly v. Cleverly, 151 Vt. 351, 358 (1989). Defendant here implies that he was entitled to an award of attorney's fees based solely

on plaintiff's financial means, but nothing in the statutes or case law supports that premise. See Willey, 2006 VT 106, ¶ 26 ("[H]usband seems to misapprehend the nature of the ability-to-pay inquiry; the question is not simply whether the requesting party has the bare ability to pay, as husband implies. Rather, the inquiry is an equitable one."). The court's final order—in which it made extensive findings to support a conclusion that defendant coerced plaintiff into marriage and that the marriage was therefore void from the outset—contains nothing to suggest that equity might favor plaintiff paying defendant's legal fees. Thus, even assuming plaintiff had the ability to pay, the court acted well within its discretion not to award attorney's fees to defendant.

Finally, defendant was not prejudiced by any inability to retain counsel. "In general, there is no right to counsel . . . in civil proceedings." In re G.G., 2017 VT 10, ¶ 10, 204 Vt. 148. Defendant had no right to an attorney in these proceedings. He claims that the trial court made certain erroneous procedural rulings during trial, which he did not object to because he does not understand the law and did not have an attorney. He also argues that he was unable to develop a theory of the case and was not very effective in his cross-examinations for the same reasons. Neither self-representation nor lack of legal knowledge or skill constitutes prejudice. See Fox v. Fox, 2022 VT 27, ¶ 39 ("Although pro se litigants receive some leeway from the courts, they are still bound by the ordinary rules of civil procedure." (quotation omitted)). Despite defendant's professed ignorance of the law, we note that he filed motions, called witnesses, testified extensively himself, cross-examined witnesses, raised objections, and interjected to assert his positions on various matters throughout the hearing. The substance of defendant's participation at the trial court assures us that he had notice of the nature of the proceeding and the claims against him, and had a fair opportunity to present his case, which is all he was entitled to. See Noble v. Noble, 2020 VT 105, ¶ 28, 213 Vt. 583 (explaining that remand is appropriate where party was given no notice or opportunity to be heard on issue that trial court adjudicated).

Defendant, now represented by counsel on appeal, devotes many pages of his appellate brief to narrating a timeline of the trial and, along the way, asserting errors in evidentiary rulings and the manner in which the court conducted the hearing. In each instance, defendant either admits that he failed to object—and blames that failure on his lack of legal counsel—or does not state whether or how he preserved the argument. We do not evaluate objections or arguments for the first time on appeal; they are not preserved if not presented to the trial court in the first instance. See Bull v. Pinkham Eng'g Assocs., 170 Vt. 450, 459 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal."). Thus, we reject defendant's arguments to the extent they were not preserved for our review. Moreover, these suggestions of error are scarcely developed as comprehensible legal arguments, if at all. They lack either citation to legal authority, a description of how the trial court erred, an explanation of how the alleged error affected the ultimate result, or some combination of these infirmities. See V.R.A.P. 28(a) (brief shall contain, among other things, specific claims of error and citations to authorities relied on); Johnson v. Johnson, 158 Vt. 160, 164 n.* (1992) (Court will not address contentions so inadequately briefed as to fail to minimally meet standards of V.R.A.P. 28(a)); In re S.B.L., 150 Vt. 294, 297 (1988) (recognizing that it is appellant's burden "to demonstrate how the lower court erred warranting reversal" and that this Court "will not comb the record searching for error"). As such, we do not consider them.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

Nancy J. Waples, Associate Justice

9